**Michael D. WILLIAMS,
Plaintiff–Appellant,**

v.

**Larry W. BURTON, James H. Deloach, Kenneth Jones, Guy Hunt, John B. Sanderson, Dr. Morgan, J. Frondorf, Morris Thigpen, Wilby Wallace, Tommy Herring, Paul Herring, Tom Allen, et al., Defendants–Appellees.**

**No. 90–7403.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 18, 1991.

---

Richard J. Ebbinghouse, Gordon, Silberman, Wiggins & Childs, Birmingham, Ala., for plaintiff-appellant.

Horace N. Lynn, Alabama Dept. of Corrections, Montgomery, Ala., for defendants-appellees.

C. Michael McInnish, McInnish, Bright & Chambless, Montgomery, Ala., for Dr. Morgan and J. Frondorf.

Before EDMONDSON, Circuit Judge, RONEY *, Senior Circuit Judge, and PITTMAN **, Senior District Judge.

PER CURIAM:

Plaintiff, Michael D. Williams, appeals from a judgment in favor of defendants in his suit under 42 U.S.C. § 1983. Williams, an Alabama prison inmate, alleged that prison officials and medical personnel violated his Eighth Amendment rights to be free from cruel and unusual punishment after he was kept in four-point restraints for approximately twenty-eight and one-half hours. We affirm.

Plaintiff was a state prison inmate for seven years assigned to the St. Clair Correctional Facility in Springville, Alabama. During his incarceration, he was convicted of eighty-four charges of violating prison disciplinary regulations. Seventy-five of those convictions were for major violations such as assault, failure to obey, threats, insubordination, intentionally creating a security hazard, and inciting to riot. Primarily because of this, Williams spent a majority of his time confined to various segregation units which house only the most boisterous and confrontational inmates. He acquired a reputation as an inmate who often expressed himself by throwing body fluids on prison officials who ventured within range of his cell.

The record shows that on August 18, 1988, at approximately 9:00 a.m., plaintiff was being interviewed by Correctional Officer Supervisor W.G. Rowell, Classification Supervisor Eleanor Coachman, and Chaplain Robert Smith during their routine reviews of segregation inmates. The three officials comprised the Institutional Segregation Review Board whose function is to review the status of each inmate in the segregation unit, on a weekly basis, to determine each inmate's suitability for continued confinement in the segregation unit or return to the prison's general population. Williams became enraged after Officer Rowell made an inquiry concerning a previous incident involving Williams. He cursed and threatened to kill both Officer Rowell and

Supervisor Coachman, and spat upon Officer Rowell. As other inmates joined in the commotion, a general disturbance arose such that the three officials were forced to discontinue their rounds and report to their superiors that "things were starting to get out of hand."

Once informed of the events, Assistant Warden James Deloach immediately ordered that Williams be taken from his cell and calmed. Shortly thereafter Deloach visited Williams' cell and tried personally to calm the inmate. After Williams continued to yell, threaten bodily harm, and spit on officials, and after hearing reports that Williams had thrown body fluids at officers from his cell within the prior twenty-four hours, Deloach ordered that Williams be placed into four-point restraints in his cell and that his mouth be covered with tape until he agreed to cooperate. Corrections officers then put Williams in the four-point restraints and placed gauze padding, secured with adhesive tape, over his mouth.

While the district court found that the defendant was released from restraints approximately twenty-four hours after the incident began, testimony from both the plaintiff and several defendants, as well as defendants' Exhibit One, a form entitled "Restraint/Suicide Watch," clearly show that Williams remained in this restrained position for twenty-eight and one-half hours with brief intervals for eating, physical exercise, and toilet use.

Plaintiff alleges that his restraint in the four-point straps and the placement of gauze and tape over his mouth violated the Eighth Amendment's prohibition against cruel and unusual punishment for the following reasons: 1) the use of these restraints was inappropriate under the circumstances; 2) prison officials failed to use appropriate safeguards once plaintiff had been placed in the restraints; 3) the use of the restraints was continued beyond any reasonable need for such measures. Plaintiff also alleges that his Fourteenth Amendment due process rights were violat-

---

* *See* Rule 34(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

ed because the restraints were used as punishment.

█ The first two claims are easily decided. The Supreme Court has held that where the conduct in question occurs in restoring official control during a prison disturbance, any security measure undertaken to resolve the disturbance gives rise to an Eighth Amendment claim *only* if the measure taken "inflicted unnecessary and wanton pain and suffering" caused by force used "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (emphasis added); *see also Graham v. Connor*, 490 U.S. 386, 398 n. 11, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir.1987). In such situations, appellate courts conduct a more deferential review of the prison officials' actions while balancing the prisoner's Eighth Amendment rights with the competing institutional concerns for the safety of prison staff and inmates. *See Whitley*, 475 U.S. at 320, 106 S.Ct. at 1084; *Ort v. White*, 813 F.2d 318, 321 (11th Cir.1987).

█ The relevant factors for consideration include: the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted. *Johnson v. Glick*, 481 F.2d 1028, 1033 (11th Cir.), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Other factors include considerations of the threat to the staff and inmates as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085, and *Brown*, 813 F.2d at 1189, n. 1.

█ Applying these principles to the particular facts of this case, the district court did not err in concluding that Williams' initial placement into the four-point restraints was both prudent and proper. St. Clair officials were faced with a volatile situation which required them to act promptly and effectively to prevent any further spreading of the disturbance. The officials were not dealing with the general prison population. Instead, the situation here arose in the context of St. Clair's segregation unit, reserved for those inmates who had demonstrated by their prior conduct that they were the most difficult, unruly, and unmanageable members of the prison population.

Assistant Warden Deloach testified that he had the plaintiff gagged because, in his judgment, Williams was trying to incite other inmates to join him in a prison disturbance and Williams' behavior, therefore, posed a significant security concern. The record demonstrates that the Assistant Warden's concerns were justified because it was the beginning of just this type of disturbance which caused the review board to discontinue its rounds and contact the Warden. Under these circumstances, the need for the physical restraint was apparent. The four-point restraints were used to reduce or eliminate Williams' ability to inflict physical harm against either himself or the correction officers. The restraints were not used for the purpose of inflicting pain. The gauze padding and tape were used to prevent Williams from encouraging further unrest among the other inmates in the segregation unit, as well as to protect the officers from his continuing spital assault. Although the record shows that while Williams experienced some discomfort because of his restraint, no actual injury was inflicted. Thus, Williams' initial placement into the restraints did not, under the circumstances, amount to the "unnecessary and wanton infliction of pain" forbidden by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

█ As to plaintiff's second claim, the record supports the decision that adequate precautions were taken to safeguard the prisoner's physical well-being through constant monitoring and examinations by medical personnel.

█ Plaintiff's third claim under the Eighth Amendment is a bit more difficult. Once restraints are initially justified, it becomes somewhat problematic as to how long they are necessary to meet the particular exigent circumstances which precip-

itated their use. The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation. *Ort v. White*, 813 F.2d 318, 324 (11th Cir.1987) (*citing Smith v. Dooley*, 591 F.Supp. 1157, 1168 (W.D.La.1984), *aff'd*, 778 F.2d 788 (5th Cir.1985)). How long restraint may be continued calls for the exercise of good judgment on the part of prison officials. Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm, *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (*citing Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)), the courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline. *Whitley*, 475 U.S. at 321–22, 106 S.Ct. at 1085; *Ort*, 813 F.2d at 323. The good faith of the officers in exercising that judgment comes into play. Prison officials here performed continuous observation and management of Williams during his restraint. It is by this observation and management that corrections officials judge, in light of their experience and expertise, whether the plaintiff's violent nature has abated. "[I]t is clear that federal courts must defer in many matters to the expert judgment of these administrators, particularly in matters of internal security and order." *Stewart v. Rhodes*, 473 F.Supp. 1185, 1187 (S.D.Ohio 1979), *aff'd*, 785 F.2d 310 (6th Cir.1986); *see also Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (citations omitted).

The district court properly held that "Williams' history of persistent disobedience and the potential for a disturbance in the segregation unit justified the continued use of the restraints and gag until the officers were reasonably assured that the situation had abated."

■ In addition to his Eighth Amendment claims, Williams argues that his restraint by the officials was a violation of the Fourteenth Amendment, alleging that restraint for such a duration constituted punishment for which he was denied due process. This claim is resolved on the finding that the restraints as applied to Williams did not constitute punishment.

In *Ort v. White*, 813 F.2d 318, 324–25 (11th Cir.1987), we drew a distinction between "punishment," a penalty administered after reflection and evaluation and intended to deter similar conduct in the future, and "immediately necessary coercive measures" made without benefit of reflection and intended to bring an end to an ongoing violation. Procedural due process considerations do not apply in the emergency situation where immediately necessary coercive action is required. Williams' restraint did not constitute punishment for his prior behavior because his placement into the four-point restraints was the result of a sudden disturbance and, therefore, not reflective. *Ort*, 813 F.2d at 324–25.

■ Although a Fourteenth Amendment violation could occur if prison officers continue to use force after the necessity for the coercive action has ceased, *Ort, supra,* at 327, the Court in *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088, stated that the Eighth Amendment was the primary source of substantive protection to convicted prisoners in cases where deliberate use of force is challenged as excessive and unjustified. The Court specifically held that "the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishment clause." *Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088. The decision in the Eighth Amendment context that the restraints were not used longer than necessary carries the decision on essentially the same Fourteenth Amendment arguments. Both arguments require the courts to show great latitude to the discretion of prison officials in inmate management. *See Bell v. Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878. We affirm the district court's deci-

sion that no constitutional violation occurred as a result of plaintiff's restraint.

 Plaintiff sued Jeanne Frondorf, R.N., the nurse who was on duty during the events. Nurse Frondorf was employed by Correctional Health Systems, a private corporation then contracted with the Alabama Corrections Department to provide health services to inmates. The only other medical personnel involved, defendant Orville Morgan M.D., was earlier dismissed upon plaintiff's own oral Rule 41(b) motion made during an evidentiary hearing held on December 8, 1989.

The district court found that Nurse Frondorf's entire interaction with the plaintiff consisted of two visits to his cell to examine his physical condition. On her first visit, at 11:00 a.m. on August 18, 1988, she found Williams in four-point restraints and gagged with gauze and tape across his mouth. She checked his vital signs and noted they were within normal limits. She returned at 2:30 p.m. and again found his vital signs acceptable. She also noted that the blood circulation in plaintiff's arms and legs was good, but recommended that some of his clothing be removed because of the heat in Williams' cell.

Plaintiff contends that Nurse Frondorf violated his Eighth Amendment rights because she was not qualified to examine him and she did not have the authority to approve or order that he be re-gagged. Plaintiff, however, admitted that his claims were based solely upon his own personal assessment that Nurse Frondorf was unqualified. Additionally, there is no evidence in the record that Nurse Frondorf had anything to do with the original decision to have plaintiff restrained, or that she ever instructed that he be returned to his restraints and be re-gagged after she completed her examinations. In fact, it appears that Nurse Frondorf was more of an advocate on Williams' behalf. She suggested that he be allowed to exercise, use the toilet, and also tried to assist with plaintiff's heat problem.

In *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir.1989), we described the two-part analysis to be used in 42 U.S.C. § 1983 claims alleging Eighth Amendment violations as to medical care. First, whether there was a serious medical need, and second, if so, did the official's response to that need amount to deliberate indifference. Here, neither prong is met. First, while there is some evidence that Williams suffered from asthma, there is no evidence which suggests that Williams had, at the time, a serious medical need other than to be constantly monitored to prevent any possible choking upon the gauze. Second, there is no evidence of physical abuse by Nurse Frondorf, nor is there any evidence of a deliberate indifference to the plaintiff's condition or serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103–06, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Accordingly, we affirm the trial court's judgment dismissing plaintiff's claims against Nurse Frondorf.

AFFIRMED.

PITTMAN, Senior District Judge, dissenting:

The plaintiff states three reasons why the defendants' actions violated his Eighth Amendment right against cruel and unusual punishment and his Fourteenth Amendment right against summary punishment: (1) the use of the four-point restraint and gag were inappropriate under the circumstances when they were first utilized; (2) prison officials failed to use appropriate safeguards once plaintiff was restrained and gagged; and (3) the use of the restraints was continued beyond any reasonable need for such measures. The majority concludes in favor of the defendants on each of these issues, holding that the plaintiff's rights were not violated. I agree with the majority's conclusion on the first two issues; however, I disagree with the majority's analysis and conclusion of the third issue. The evidence in this case clearly establishes that no reasonable penological need existed for the defendants to restrain the plaintiff over a period of twenty-eight hours and thirty minutes, and gag him over a period of thirteen and one-quarter hours; therefore, I respectfully dissent.

The issue of whether the use of the four-point restraint and gag was inappropriate under the circumstances when initially utilized by the defendants is not easily decided, notwithstanding the majority's opinion. When the incident in question occurred, the plaintiff had a long and troublesome record of disobedience. Following the plaintiff's outburst, prison officials gagged and placed him in a four-point restraint in his cell. The reason given for these methods of restraint was that Williams' behavior posed a threat to prison security, specifically "that things were getting out of hand." According to the defendants, a significant factor for the imposition of the four-point restraint was that Williams was confined to the segregation unit. A segregation unit of a prison is reserved for the most difficult and troublesome prisoners. The specific reasons given for the gagging of the plaintiff and placing him in the four-point restraint was his refusal to stop spitting on the prison officials and from creating a commotion by yelling and banging on the walls and door of his cell. The plaintiff was also throwing objects at people outside his cell through a small slit in his cell door (affidavit of Rowell).

Close examination of the circumstances on the morning of August 18, 1988, cast doubt on the claimed need for a four-point restraint in addition to a gag. Photographs of the cells in the segregation unit reveal them to be one-member cubicles secured by a locked, solid, metal door (photos attached to vol. 1, doc. 10). The only access from these cells to the remainder of the segregation unit is through a narrow window slit in the door.

The security risk posed by the plaintiff's behavior does not appear to have been great. The other prisoners within the segregation unit were secured within their individual cells behind locked doors, unable to come to the aid of Williams. Williams' cell was secured and isolated from direct contact with the other prisoners within the segregation unit. Therefore, except for spitting, he posed no physical threat to either the prison officials or his fellow prisoners. The clearest danger he posed was instigating a general uproar which could have resulted in unforeseen consequences.

However, Williams could have been gagged and controlled without using the four-point, spread-eagle restraint, been charged with a prison violation, been given a hearing, and then have been legally punished.

These facts tend to establish there was no necessity for the four-point restraint, and the use of the gag or some less severe type of restraint would have been reasonable at that time. I must conclude, however, that the defendants should prevail on this issue. In balancing the prisoner's Eighth and Fourteenth Amendment rights against institutional concerns of security and safety, the courts must give deference to the decisions of prison officials acting to insure the proper administration of a penal institution. *Ort v. White*, 813 F.2d 318, 322 (11th Cir.1987). Prison officials should be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

The court must give due regard to the defendants' exercise of discretion. Assistant Warden DeLoach states in his affidavit that there was a fear the plaintiff might incite the other members of the segregation unit, that the plaintiff refused to calm down, and that the plaintiff was physically resisting the defendants' efforts to restrain him. Given these facts along with the plaintiff's history of misconduct, the undersigned is unwilling to use hindsight and supplant his judgment for that of the prison officials who were on the scene of the disturbance. Therefore, I would affirm the district court's finding that the initial decision to place the plaintiff in a gag and four-point restraint was not unreasonable.

Although the use of the four-point restraint for twenty-eight hours and thirty minutes was not necessary, I recognize that the record indicates the plaintiff suffered minimal infliction of pain, which precludes his Eighth Amendment claim. *See Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir.1990) (plaintiff must suffer injury beyond a minimal one). Therefore, I dis-

sent only with the majority's decision regarding the plaintiff's Fourteenth Amendment summary punishment claim.

The continued use of these restraints, long after the plaintiff was shown to be calm and cooperative, violated the plaintiff's Fourteenth Amendment right to be free from summary punishment. Once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments. *Ort v. White*, 813 F.2d 318, 324 (11th Cir.1987) (quoted by the majority opinion). If force is applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm, then the courts will not second-guess the decision of the prison officials. *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

The majority presumes the defendants acted in good faith, without scrutinizing the facts surrounding the continuous restraint of the plaintiff. In fact, at no point in either the majority opinion or the district court's order is there even a cursory review of the facts surrounding the plaintiff's continuous restraint. The uncontested facts established in this case by the defendants' own affidavits and official records clearly show that the need for maintaining the use of the four-point restraint and gag disappeared shortly after they were first utilized, and that the only plausible purpose for the continued use of these devices was that of punishing the plaintiff.

The plaintiff was initially gagged and placed in a four-point restraint at approximately 9:45 a.m., August 18, 1988 (affidavit of DeLoach). Warden DeLoach, who had ordered that the plaintiff be gagged and restrained, instructed Lt. Jones to assign an officer to monitor the plaintiff for as long as he remained gagged and bound (affidavit of DeLoach). Lt. Jones assigned Officer G. Wade to monitor the plaintiff and to keep a log of the plaintiff's condition, noting said condition every fifteen minutes (the log is defendants' exhibit # 1). The log provides number codes designating the activity or condition of the prisoner during observation. Between 10:00 and 11:00 a.m. of August 18, the log reflects that the plaintiff was yelling and crying; however, the log reflects that at all times after 11:00 a.m. on August 18, the plaintiff was either sleeping, quiet, relaxed, or eating (defendants' exh. # 1).

After the plaintiff had removed or loosened the gag from his mouth, he complained of shortness of breath due to the gag (affidavit of G. Wade). Sergeant Sanderson, upon being informed of plaintiff's complaint, had Nurse Frondorf check the plaintiff's condition (affidavit of J. Sanderson). Nurse Frondorf inspected the plaintiff between 11:00 and 11:15 a.m. and found his respiration to be normal. Sergeant Sanderson then recovered the plaintiff's mouth without any resistance (affidavit of J. Sanderson). Nurse Frondorf's notes indicate the plaintiff was crying, and said "I won't do it again." While the gag was removed, the plaintiff did not spit on anyone or yell in an attempt to incite the other prisoners.

Following a second examination and request by Nurse Frondorf, Williams was allowed to use the toilet and to have a drink of water at 2:45 p.m. on August 18 (affidavits of J. Sanderson & G. Wade). The plaintiff was completely untied, ungagged, and allowed to move freely about within his cell for about five minutes. The attending officers did not report that the plaintiff attempted to spit on anyone, threatened physical violence or attempted to incite his fellow prisoners (*See* affidavits of J. Sanderson & G. Wade). The log, initialed by Officer Wade, indicates that Williams was quiet during this time (defendants' exh. # 1). Although the undisputed evidence establishes the plaintiff was subdued, cooperative, and under control at this time, the prison officials again placed him in the four-point restraint. The plaintiff remained in the four-point restraint for another twenty-three hours and thirty minutes.

At 4:30 p.m. that same afternoon, prison officials released the plaintiff from the gag and four-point restraint so that he could eat his dinner (affidavit of D. Turner). According to the officer on the scene, the plaintiff refused to eat and was placed back in the four-point restraint; however, the log re-

flects that he accepted his meal (affidavit of J. Patrick). Williams was left ungagged until about 5:30 p.m., when Warden De-Loach ordered that the gag once again be placed over Williams' mouth (affidavit of J. Patrick). The record indicates that at no time while unrestrained did Williams attempt physical violence or to misbehave. The record also indicates that at no time did Williams attempt to spit on anyone or call to his fellow prisoners while he was ungagged.

At approximately 11:00 p.m., thirteen and a quarter hours after Williams had been originally restrained and gagged, Warden DeLoach ordered the gag be removed (affidavit of DeLoach). The four-point restraint, however, was not removed. Warden DeLoach states in his affidavit that "the mouth covering was removed from Inmate William's mouth ... *when he indicated that he would cooperate and not spit or attempt to incite the other inmates in the unit*" (affidavit of DeLoach) (emphasis added). Once ungagged, Williams did not attempt to spit, talk or cause a commotion. The observation log indicates that Williams was calm and quiet throughout this period (defendants' exh. # 1).

The plaintiff was not allowed to be unrestrained nor did he use the toilet from 5:30 p.m. of August 18, to 3:15 a.m. of August 19, a total of nine hours and forty-five minutes. At 3:15 a.m., the plaintiff was released from the four-point restraint and allowed to use the toilet. Again, the plaintiff remained calm and quiet, and at no time did he misbehave (defendants' exh. # 1). At 12:55 p.m., nine hours and forty minutes later, Williams was again allowed to use the toilet (affidavit of J. Sanderson). Once again, he remained quiet, and did not misbehave while unrestrained (affidavit of J. Sanderson & defendants' exh. # 1). Finally, the plaintiff was released and freed from the four-point restraint at 2:15 p.m. on August 19, twenty-eight and one-half hours after he was initially bound.

The defendants' stated reason for gagging and restraining Williams was that his conduct, specifically his spitting and yelling, posed a security risk, i.e., incitement of his fellow prisoners in the segregation unit. The evidence above, however, clearly proves there was no need for such devices shortly after they were first employed. By the time Nurse Frondorf first examined Williams (11:00 a.m., August 18), the prisoner was repentant and did not spit on anyone even though his gag had come loose. Despite this, the defendants chose to replace the gag.

At 11:00 p.m. of August 18, the gag was removed because, in Warden DeLoach's words, the plaintiff indicated that he would "cooperate and not spit or attempt to incite...." If the plaintiff did indeed indicate to Warden DeLoach's satisfaction that he would behave, then the plaintiff should have been released from the four-point restraint, as well as the gag, at that time. Warden DeLoach's affidavit clearly establishes that the plaintiff agreed to cooperate and behave, and that as a result the Warden ordered the gag to be removed (affidavit of J. DeLoach). In Warden DeLoach's own words, the need for the continued use of the four-point restraint no longer existed at the time the gag was removed; however, despite this fact, the plaintiff needlessly remained in the four-point restraint in excess of another fifteen hours. (affidavit of DeLoach). The only conclusion to be drawn from Warden DeLoach's decision is that he intended the restraint to do more than merely prevent a disturbance.

From the initial use of restraints and gag at 9:45 a.m., August 18, until their complete removal twenty-eight and one-half hours later, at 2:15 p.m., August 19, the plaintiff was released from the four-point restraint and the gag four different times in order to use the restroom or to eat. The gag alone was removed on two other occasions. During each of these six separate occasions, the plaintiff was calm and did not misbehave in any manner; however, the four-point restraint continued to be needlessly imposed by the defendants, to wit: (1) 11:15 a.m. (gag loosened or removed temporarily, 1 hour and 30 minutes after initially restrained); (2) 2:45 p.m. (all restraints removed temporarily, 5 hours later); (3) 4:30 p.m. (all restraints removed temporarily, 6 hours and 15 minutes later); (4) 11:00 p.m. (gag removed permanently, 13 hours and 15 minutes later); (5) 3:15 a.m., August 19 (all restraints removed

temporarily, 17 hours and 30 minutes later); and (6) 12:55 p.m. (all restraints removed temporarily, 27 hours and 10 minutes later).

All restraints were finally removed at 2:15 p.m., August 19. The evidence clearly demonstrates the plaintiff was subdued one hour and forty-five minutes after the restraints were initially used; however, the restraints were continued for an additional twenty-six hours and forty-five minutes. Even if, out of an abundance of caution, deference should be given to the decision of the officials on the scene to keep the plaintiff in the restraints after this point, the evidence clearly demonstrates the restraints should have been discontinued altogether at 2:45 p.m., August 18, four hours after their initial imposition. In addition, as noted above, Warden DeLoach admits that as of 11:00 p.m., August 18, the legitimate reasons for the four-point restraint no longer existed. The continued use of these restraints in spite of several demonstrable occasions when the gag and/or four-point restraint were removed and the plaintiff was subdued, clearly proves he was the victim of summary punishment in violation of his Fourteenth Amendment right to due process. It also shows a shocking disrespect by the defendants for this most basic constitutional right.

The majority takes comfort in the fact that Warden DeLoach ordered the plaintiff be kept under constant observation and that he occasionally be allowed to use the toilet. The fact remains that the restraint and gag were unnecessary shortly after they were first utilized. Moreover, the very measures which according to the majority lend reasonableness to the defendants' chosen form of restraint, clearly establish that the measures were unnecessary: every time the plaintiff was unbound and ungagged, he behaved. Finally, the majority's opinion creates an environment in which impermissible punishments of the most pernicious form are not discouraged nor prohibited. Prison officials will be encouraged to disguise obviously unnecessary restraints with the semblance of "reasonable safeguards;" however, no reasonable safeguard can disguise the fact that the continuous use of the restraints employed by the defendants was unnecessary at some point shortly after they were first utilized.

I concur with the majority's decision that the initial use of the restraints was not inappropriate. However, for the reasons stated above, I respectfully dissent from the majority's decision that the continued use of the gag and four-point restraint did not violate the Fourteenth Amendment. I would hold that the district court's conclusions were clearly erroneous and that the evidence clearly establishes the defendants imposed summary punishment on the plaintiff in violation of the Fourteenth Amendment. I would remand this case to the district court to vacate its order on this issue and determine damages.