**Hardie Vertrain SIMS, Jr., Plaintiff–Appellee,**

v.

**MASHBURN, Officer, COI, Defendant,**

**John B. Sanderson, Sgt., Defendant–Appellant,**

**Gene Kelly, Officer, COI; Malone, Officer, COI; L. Burton, Warden, Defendants.**

No. 92–6944.

United States Court of Appeals, Eleventh Circuit.

July 12, 1994.

---

Harry A. Lyles and Ellen R. Leonard, Montgomery, AL, for appellant.

Tony G. Miller, Birmingham, AL, for appellee.

Before KRAVITCH and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

COX, Circuit Judge:

Sgt. John Sanderson, a prison official at the St. Clair Correctional Facility, appeals the judgment of the district court. The district court held that Sanderson had violated inmate Hardie Sims's Eighth Amendment right to be free from cruel and unusual punishment and awarded $500 in damages. We reverse.

## I. Background [1]

On August 27, 1990, Sims, an Alabama prison inmate, was serving a twenty-one year sentence for robbery. He was housed in the administrative segregation unit at the St. Clair Correctional Facility. Sanderson was serving as shift commander in the unit for the first shift, from 6:00 A.M. to 2:00 P.M.

Sometime before 9:30 A.M., Correctional Officer Gene Kelly noticed that Sims had placed a towel over the exterior window of his cell. Kelly instructed Sims to remove the towel because it obstructed Kelly's view of Sims's cell by darkening it, presenting a security threat. Sims initially complied, but immediately replaced the towel after Kelly left. When Kelly again noticed the towel, he contacted his immediate supervisor, Sanderson.

When Sanderson arrived, he ordered Sims to place his hands through the tray slot of the cell to be handcuffed, which Sims did. Sanderson and Kelly then entered Sims's cell and noticed that Sims had placed a towel in the toilet. The toilet had not been flushed and there was no flooding in the cell, but the officers viewed this as an implicit threat to flood. Flooding can require vacating all cells in the segregation unit.[2] Sanderson and Kelly removed the towel and left the cell.

Later, Kelly again noticed that Sims had obstructed the view to his cell by placing either a pair of pants or a sheet over the window.[3] Kelly again contacted Sanderson, who then contacted Officers Jackie Mashburn and Gary Malone. Mashburn and Malone were not assigned to the cellblock where Sims was confined but were called over to assist. When the four officers met outside Sims's cell, Sims began yelling that he would not take any more "harassment" and that if they entered his cell, "I'll buck; you'll have to kill me." Sims then called Kelly a "redneck, cracker-ass bitch."

Despite Sims's belligerence, he complied with orders to put his hands through the tray slot to be handcuffed. Sanderson and the other three officers then entered Sims's cell while Sims stood outside. Sims continued to shout at the officers. Sanderson then decided to "strip" Sims's cell. The four officers removed Sims's mattresses, personal proper-

1. The facts were disputed at trial. Our statement of the facts is essentially based upon the district court's findings.

2. Inmates sometimes flood their cells in this manner to create security disturbances.

3. Kelly testified a sheet was hung while Sims testified he hung a pair of pants.

ty, blankets, and all of his clothes except his undershorts. Additionally, the water to Sims's toilet was disconnected, but the water to his sink remained on.

Sims's cell remained in this condition the rest of the day, that night, and until approximately 2:30 P.M. the next day. During that time, Sims's only clothing was his undershorts and he slept on the concrete floor of the cell.

There is a conflict in the testimony relative to whether water to the commode was turned back on. Sanderson testified that he ordered the water turned back on at the end of his shift at 2:00 P.M. on the day the cell was stripped while Sims testified he could not flush his toilet throughout the strip cell status. The magistrate judge, while faulting Sanderson for not checking to make sure it was done, made no finding as to whether the water was in fact turned back on.[4]

Kelly completed an institutional incident report concerning the occurrence.[5] Sanderson also filed a "Stripped Cell Form."[6] The prison psychologist, Dr. Brister, visited Sims during this time. Brister's notes detailed that Sims was well-oriented to time, place, and persons. Brister's notes concluded with the notation, "Just wanted to complain."

## II. Procedural History

In October 1990, Sims filed a complaint asserting a variety of claims, including a claim that the defendants stripped his cell without cause. Sims named Kelly, Mashburn, Malone, Sanderson, and Warden Larry Burton as defendants.

Magistrate Judge Putnam, to whom the case was assigned, characterized the complaint as alleging 42 U.S.C. § 1983 claims. The magistrate judge ordered the defendants to file a special report addressing the events described in Sims's complaint. The defendants filed a report, and it was treated as a motion for summary judgment. The magistrate judge recommended the grant of summary judgment in favor of Warden Burton, but recommended the denial of summary judgment for the remaining defendants. The district judge adopted this recommendation, and thereafter the magistrate judge conducted an evidentiary hearing.

Following the hearing, the magistrate judge issued a report recommending that judgment be entered for Sims in the amount of $500 against Kelly, Mashburn, Malone, and Sanderson. The magistrate judge found that the initial decision to strip Sims's cell was justified. He also found, however, that there was no evidence that Sims continued to be a security threat through the night and the following day. The magistrate judge's report on this claim concluded:

> Given the apparent lack of effort by them [the four officers] to determine whether the plaintiff continued to constitute a security threat or whether he had ameliorated his conduct, the court must infer that the continuation of the stripped-cell status was not the product of defendants' good faith effort to restore discipline, but rather, was the wanton imposition of unnecessary pain.

(R. 1–28–14). This Eighth Amendment violation, the magistrate judge concluded, made a $500 damage award appropriate.

The district judge issued a memorandum opinion rejecting the recommendation that judgment be entered against Kelly, Mashburn, and Malone, but adopting the recommendation that Sanderson be held liable. The district judge concluded that the prison official making the decision to strip a cell assumes a continuing responsibility to moni-

---

**4.** Sanderson testified that when water to a commode is turned off, the inmate is allowed to flush the commode at the end of each shift.

**5.** Kelly wrote the following in the report:
> The cell and inmate Sims were stripped, per Sgt. Sanderson, due to disorderly conduct and threats. Inmate Sims did not resist and the officers did not have to use fore [sic]. Disciplinary action is pending for # 56, from Officer Kelly. Sims remains in a stripped cell, H1–C–126.

Def. exh. 1.

**6.** Under the heading "Reason Inmate Stripped," Sanderson wrote:
> Inmate Sims placed a sheet over cell window preventing officers from viewing. Sims refused to remove the window coverings. Officers entered his cell to remove the covers. Sims resisted and threatened to harm the officers and stated staff would have to "kill him."

Def. exh. 4.

tor the inmate to determine when the continued use of the strip cell is no longer penologically justified. (R. 1–32 at 4). Because Sanderson was found to have failed to assume this responsibility, the court concluded that Sanderson violated Sims's Eighth Amendment right to be free from cruel and unusual punishment when the cell remained stripped longer than was penologically justified.

### III. Issues on Appeal and Contentions of the Parties

Sanderson argues that the evidence does not support the court's finding that he violated Sims's Eighth Amendment rights. A component of this argument is the contention that the district court utilized the wrong state of mind standard under the Supreme Court's Eighth Amendment jurisprudence. Another component of this argument is the contention that Sims's claim arises out of the initial stripping of his cell, and that Sims neither alleged nor proved that Sanderson defaulted in any obligation to monitor him after his cell was stripped.

Sanderson also argues that the district court erred in rejecting his qualified immunity defense, and that the $500 damage award is excessive.

Sims counters that the evidence supports the judgment and that the district court did not err on any of these issues.

### IV. Standard of Review

We review the district court's factual findings under the clearly erroneous standard, see Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), while a district court's legal conclusions are reviewed de novo. United States v. Dukovich, 11 F.3d 140, 141 (11th Cir.1994) (citing United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir.), cert. denied, 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990)).

### V. Discussion

■ Sanderson complained at oral argument in this case that he was unprepared to defend a claim predicated upon a failure to monitor Sims after the cell was stripped since the claim in Sims's complaint was based upon the initial stripping of the cell.[7] We read briefs liberally to determine what issues are presented, see Kincade v. General Tire & Rubber Co., 635 F.2d 501, 504 (5th Cir.1981)[8], but Sanderson's brief, read liberally, does not present this issue. It is clear from the brief filed on behalf of Sims that counsel for Sims did not read Sanderson's brief as having presented this issue. The argument is not without appeal. The claim in the complaint does seem to be predicated upon the initial decision to strip the cell. This explains why the evidentiary hearing did not clearly focus on the question of when and by whom Sims should have been reevaluated. Nevertheless, we conclude that Sanderson has waived any argument that failure to monitor was not part of the claim and that he was therefore unprepared to defend such a claim. See United States v. Milam, 855 F.2d 739, 743 (11th Cir.1988) (citing Rogero v. Noone, 704 F.2d 518, 520 n. 1 (11th Cir.1983); Harris v. Plastics Manufacturing Co., 617 F.2d 438, 440 (5th Cir.1980)); see also Fed. R.App.P. 28(a)(4) ("The brief of the appellant shall contain ... the contentions of the appellant with respect to the issues presented").

■ We now turn to Sanderson's argument that the evidence does not support the court's finding that he violated Sims's rights under the Eighth Amendment. An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind. Hudson v. McMillian, —— U.S. ——, ——, 112 S.Ct. 995, 999, 117 L.Ed.2d 156

---

7. Sanderson also raised this argument in his objections to the Report and Recommendation of the magistrate judge. (R. 1–29).

8. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

(1992). Sanderson argues that proof of both components falls short.

The magistrate judge's finding, adopted by the district judge, was that "the discomfort and humiliation" caused by being left for approximately 29 hours clothed only in undershorts in a "concrete box" justified relief. We entertain serious doubt about whether harm of this kind is objectively harmful enough to establish an Eighth Amendment violation. We think it clear, however, that proof of the subjective component is lacking in this case, and therefore choose to predicate our holding on the failure of proof as to this component.

■ When the conduct in question involves any measure taken to prevent a security threat or restore official control, the Eighth Amendment inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or inflicted maliciously or sadistically for the very purpose of causing harm." *Hudson,* —— U.S. at ——, 112 S.Ct. at 998 (quoting *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)). Sanderson argues that the district court used the wrong standard in analyzing the subjective component in this case. Sanderson's argument is far from clear, but he seems to suggest that the district court used the "deliberate indifference" standard rather than the higher standard applicable when the conduct in question involves a security threat. *See id.*[9] The magistrate judge made findings that both standards were violated. He found the defendants "deliberately indifferent" (R. 1–28–14), but also found that continuation of the strip cell status "was not the product of defendants' good faith effort to restore discipline, but, rather, was the wanton imposition of unnecessary pain." (*Id.*). The district judge adopted these findings relative to Sanderson. Sanderson's complaint that the court applied too low a standard is therefore without merit.

We conclude that the evidence does not support a finding that Sanderson's failure to monitor Sims after the stripping of his cell was conduct that can be characterized as malicious and sadistic, engaged in for the purpose of causing harm. In reaching a contrary conclusion the district court failed to give prison officials the deference they are entitled to and ignored Sanderson's compliance with policies that were in place at this institution.

Our recent decision in *Williams v. Burton,* 943 F.2d 1572 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992), involved similar issues. Williams was a prisoner in the same prison, housed in the segregation unit, as was Sims.[10] *See id.* at 1575. After a pattern of insubordination by Williams, prison officials decided to place him in four-point restraints and gag his mouth with gauze padding secured with adhesive tape. *Id.* at 1574. Williams remained in this condition for over twenty-eight hours "with brief intervals for eating, physical exercise, and toilet use." *Id.* We held that the initial decision to place Williams in restraints was justified as he was trying to cause a disturbance among inmates in the segregation unit. *Id.* at 1575. The court then addressed Williams's claim that the restraints and gag were imposed longer than necessary.

The court stated that "[o]nce restraints are initially justified, it becomes somewhat problematic as to how long they are necessary to meet the particular exigent circumstances." *Id.* The general principle, explained the court, is that the application of force after it is no longer penologically justified can violate the Eighth Amendment. *Id.* at 1576. However, the court was quick to point out that once the initial application of force is determined to be justified, "the courts give great deference to the actions of prison officials in applying prophylactic or preventative mea-

---

9. In *Hudson,* the Court delineated the two standards for an Eighth Amendment claim. For security threats, a "malicious and sadistic" standard applies, while a "deliberate indifference" standard applies to prison conditions and medical needs claims. *Hudson,* —— U.S. at ——, 112 S.Ct. at 998.

10. As we have previously observed, the St. Clair Correctional Facility's segregation unit is "reserved for those inmates who ha[ve] demonstrated by their prior conduct that they [are] the most difficult, unruly, and unmanageable members of the prison population." *Williams,* 943 F.2d at 1575.

sures intended to reduce the incidence of riots and other breaches of prison discipline." *Id.* (citing *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986); *Ort v. White,* 813 F.2d 318, 323 (11th Cir.1987)). The court further stated that "[t]he good faith of the officers in exercising [their] judgment comes into play." *Id.*

A decision relative to when the penological justification for the stripping of Sims's cell ended is necessarily subjective. In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Court addressed a decision by prison administrators to confine an inmate to administrative segregation. The Court said:

> As we said in *Rhodes v. Chapman,* 452 U.S. 337, 349, n. 14, 101 S.Ct. 2392, 2400, n. 14, 69 L.Ed.2d 59 (1981), "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se,* and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

*Hewitt,* 459 U.S. at 474, 103 S.Ct. at 872–73.

The district court appears to have credited Sims's testimony that he was not disruptive after his cell was stripped. St. Clair Correctional Facility's Standard Operating Procedure 317 ("SOP 317") contemplates that strip cell status should be terminated when "the inmate demonstrates a period of stable behavior counter indicative of the need for placement in restraint/strip cell status." The question in this case boils down to a subjective judgment relative to when Sims had demonstrated such a period of stable behavior and a subjective judgment relative to the intervals at which that question should be reevaluated.

Implicit in the actions of the officers in maintaining the strip cell status is the judgment that Sims did not sufficiently demonstrate a period of stable behavior until sometime around 2:00 P.M. the following day. Giving these officials the deference they are due requires that we accept that judgment unless there is evidence justifying its rejection. There is no such evidence in this case. Similarly, a judgment that Sims should have been reevaluated sooner finds no evidentiary support in this record. A finding that something less than this 29 hour or so "cooling off" period was sufficient fails to give the judgment of these officials the deference they are due.

The prison officials had an established guideline to follow in administering Sims's strip cell. SOP 317 of the St. Clair Correctional Facility provides the procedures to be followed for the imposition of therapeutic restraints and strip cells. (Def. Ex. 3). A shift commander, as Sanderson was, may make the initial decision to strip a prisoner's cell. (Def Ex. 4 "V. Procedure C. 1."). Once a cell is stripped, the prison psychologist must be consulted and a strip cell form must be completed. (*Id.* at C. 2. & 3.). Additionally, SOP 317 provides that an inmate in restraint/strip cell status shall be observed at least once every 15 minutes, and this monitoring "shall be documented on a restraint checklist" which is posted on the prisoner's door. (Def. Ex. V. Procedure E. 2. & 3.). SOP 317 provides that correctional officers shall perform this monitoring. (*Id.* at IV. K.). Finally, the procedure designates the Captain as the individual responsible for the administrative supervision of strip cell status inmates. (*Id.* at IV. B.). SOP 317 also provides that maintaining strip cell status

beyond 72 hours requires that "reasons for continuation shall be fully documented on a restraint/strip cell form by a qualified mental health professional, such as a psychologist or psychiatrist."

The district court's opinion appears to redefine to some extent prison officials' responsibilities. We find no clear error in the district court's finding that Sanderson had a continuing duty to monitor Sims for the purpose of deciding when terminating strip cell status was in order. The court's opinion suggests, however, that Sanderson could not assume that others involved in this process would monitor Sims, and to this extent the court improperly redefines the responsibilities of the officials involved.

The evidence is that SOP 317 was followed. Sanderson, as shift commander, was authorized to place Sims on strip cell status. The prison psychologist met with Sims after the cell was stripped.[11] A strip cell form was completed by Sanderson shortly after Sims's cell was stripped. (Def. Ex. 4). Sanderson gave orders that Sims be monitored (*Id.*). (R. 2 at 11).[12] Finally, SOP 317 authorized Captain Robert Simmons, as supervisor, to determine when to terminate Sims's strip cell status. Simmons terminated Sims's strip cell status.

Surely compliance with established prison procedures by Sanderson is evidence of the exercise of "good faith" that *Williams* requires. The policy itself reflects a well-developed and planned procedure in a field where prison officials, not judges, are experts. *See LaMarca v. Turner,* 995 F.2d 1526, 1543 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (quoting *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir.1981)). As the Supreme Court has counseled, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are

needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *see also Hewitt,* 459 U.S. at 474, 103 S.Ct. at 872–73 (1983); *LaMarca,* 995 F.2d at 1526; *Fortner v. Thomas,* 983 F.2d 1024, 1029 (11th Cir. 1993); *Battle v. Barton,* 970 F.2d 779, 782 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1300, 122 L.Ed.2d 690 (1993); *Ort,* 813 F.2d at 321. This deference is not absolute and does not "insulate from review actions taken in bad faith or for no legitimate purpose." *Ort,* 813 F.2d at 322 (quoting *Whitley,* 475 U.S. at 322, 106 S.Ct. at 1085). Instead, it "requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.*

### VI. Conclusion

For the foregoing reasons, judgment in favor of Sims and against Sanderson is reversed.

REVERSED.

---

11. Although none of the officers could testify whether they immediately contacted the psychologist, Captain Simmons testified that the psychologist was informed by receiving a copy of the strip cell form that Sanderson filed. (R. 2 at 88–89).

12. Sanderson filed a motion to supplement the record with the segregation logs to prove that Sims was monitored in accord with SOP 317. R. 1–30). Sanderson filed the motion along with his objections to the magistrate judge's report, but the district court did not address the motion in its memorandum opinion. (*See* R. 1–32).