Kimberly CAMPBELL, Plaintiff-Appellant,

v.

James SIKES, et al., Defendants-Appellees.

No. 98-8265.

United States Court of Appeals,

Eleventh Circuit.

March 19, 1999.

Appeal from the United States District Court for the Middle District of Georgia. (No. 5:94-CV-345-3(CWH)), Claude W. Hicks, Jr., Judge.

Before COX, CARNES and HULL, Circuit Judges.

HULL, Circuit Judge:

Plaintiff-Appellant Kimberly Campbell appeals the magistrate judge's grant of summary judgment for Defendants on her medical-treatment and excessive-force claims under 42 U.S.C. § 1983. After review, we affirm.

## I. FACTS[1]

On May 28, 1991, Plaintiff-Appellant Kimberly Campbell was transferred to the Georgia Women's Correctional Institution ("GWCI") to serve five years of a ten-year sentence for distribution of cocaine and interference with government property. Plaintiff's constitutional claims arise from the medical treatment she received at the GWCI state prison between May 28, 1991, and January 30, 1992.

A.      Mental Health Treatment

The day Plaintiff arrived at GWCI, she was seen by physician Grant Carmichael, who noted that Plaintiff had a history of suicidal threats and had taken psychotropic drugs previously at the Cobb County jail. Carmichael referred Plaintiff to the mental health staff for a mental status exam.

_____

[1]The magistrate judge devoted 43 pages of a 102-page order to giving a detailed summary of Plaintiff's treatment at GWCI. Rather than reiterating the same details, we give only an overview of the facts, highlighting a few representative occurrences of Plaintiff's self-destructive behavior and Defendants' various responses.

That same day, Plaintiff met with mental health counselor Anne Weathers for a mental status exam. Weathers obtained from Plaintiff extensive details about her psychiatric history, including prior medications, hospitalizations, treatments, and symptoms, and she prepared a three-page report summarizing her observations and findings.

Weathers's report first details Plaintiff's own descriptions of her history of alcohol and drug use. Plaintiff admitted using drugs on and off since age thirteen and drinking excessively—as much as a half pint of liquor a day and a quart of beer a day. The report indicates that Plaintiff used marijuana at first, then beer, Valium, and ultimately "cocaine/crack."

Weathers's report then focuses on Plaintiff's psychiatric history. Plaintiff told Weathers that while in school, she received mental health services for "problems with nerves" but no medications. Plaintiff also reported having a "nervous breakdown" at age eighteen, being hospitalized for a month and a half, receiving Valium, and having a seizure. After release from the hospital, Plaintiff received services in a day hospital for several months. She continued to have problems with nerves and panic attacks, and she got Darvon and Valium from friends to help her cope with these problems. Plaintiff related two suicidal incidents to Weathers: at age nineteen, Plaintiff cut her wrist superficially, and at age twenty-two, she took an overdose of lithium in the presence of her husband's son.[2]

Weathers's report next turns to Plaintiff's treatment at the Cobb County jail after she was arrested on the cocaine offense. Plaintiff told Weathers that while in the jail, she became anxious, was panicky, heard loud bells ringing in her head, began to sweat, and felt claustrophobic. Plaintiff reported that she was seen by a psychologist and received lithium, Stelazine, Mellaril and Benadryl. According to Plaintiff's account,

---

[2]In the district court, Plaintiff introduced medical records showing that between 1982 and 1988, she had been hospitalized thirteen different times seeking treatment for depression, mood swings, suicide attempts, anxiety, paranoia, sleep disturbances, and substance abuse. Although these records show Plaintiff was treated with various medications, including Stelazine and lithium, they show no diagnosis of bipolar disorder—the diagnosis Plaintiff contends Defendants should have made.

she received mental health care in the jail because she told jail officials she was thinking of harming herself. Plaintiff reported that the last four days at the jail, she had not received any medications.

Weathers's report states that she contacted the Cobb County jail and confirmed that Plaintiff had received the above medications at the jail and that when she left their facility she was taking Trilafon. The jail also advised that Plaintiff was intoxicated upon admission to the jail, was unstable and began taking off her clothes, and made statements about self injury. The jail placed her on suicidal precaution. Weathers's report relates that the jail officials believed Plaintiff's suicide threats were a "manipulative ploy" because the jail was reducing her medication:

> They said that off and on throughout the stay that she did make statements about intent to harm herself, but that it was noted that it appeared to be a manipulative ploy in that they were reducing her medication to stabilize her. They did not consider that she was making a serious suicide threat; however, they did place her on suicide watch on several occasions as a precaution.

Weathers's report also contains Weathers's own observations from interviewing Plaintiff. According to the report, Plaintiff's memory was intact for recent and remote events, and there was no evidence Plaintiff was responding to hallucinations. While denying "delusions and grandiose ideation," Plaintiff reported being anxious, described a fear of being out of control, and requested to see a doctor to be placed on medication "to help her rest." Weathers's report concludes with the following recommendation that Plaintiff be seen by a psychiatrist:

> Ms. Campbell reports a history of panic attacks and anxiety related symptoms. She also gives a history of suicidal thoughts and manipulative suicidal acts. At the present time, she denies intent to harm herself and signs of anxiety. As she was taking medication while in the Cobb County jail it is recommended that she be seen by Dr. Sikes to evaluate the need for continuing medication and to make recommendation for treatment.

Dr. James Sikes, a psychiatrist, met with Plaintiff on June 3, 1991. Before the meeting, he reviewed Weathers's report, which he noted specified that Plaintiff had been prescribed psychotropic drugs lithium and Trilafon at the Cobb County jail. Sikes noted, too, that Plaintiff had related a long history of intravenous use of cocaine as well as heavy alcohol consumption. His report states that the intermittent anxiety and psychiatric hospitalizations in Weathers's report appeared to arise from complications with drugs and

3

medication. Moreover, Sikes noted that Plaintiff denied having any schizophrenic episodes, auditory hallucinations, or delusional thoughts.

At the meeting with Plaintiff, Sikes observed Plaintiff's current condition. He found her to be calm and cooperative. He saw no evidence of delusional thought or loosening of associations. After meeting with Plaintiff and reviewing Weathers's report, Sikes directed that Plaintiff's Trilafon be discontinued.

Sikes scheduled a follow-up session with Plaintiff for July 1 in order to observe her behavior once she had been off Trilafon for a few weeks. Sikes's report from that meeting notes the absence of any reported problems up to that point. The report also states that at the interview, Plaintiff told Sikes she had experienced trouble sleeping and "what she consider[ed] as normal adjustment to the prison." Sikes suggested increased activity but reported "no evidence of a schizophrenic illness."

Sikes met with Campbell again on August 12. His reports from that meeting indicate he diagnosed Plaintiff as suffering from polysubstance abuse arising from her prior alcohol and drug abuse. Sikes also noted that Plaintiff was "angry and resentful of being called up to talk about things" and that she would probably "continue to clash with authoritative figures." His thoughts on Plaintiff's condition remained unchanged: "I see no indication of schizophrenia or Bipolar Disorder and will continue to see her as needed should further concerns occur." Sikes found no indications of schizophrenia (a thought disorder) or bipolar disorder (a mood disorder) because Plaintiff showed "no looseness of associations, no evidence of delusional thought"; he explained, "this seems to be a failure to adjust to the conditions of incarceration rather than a presence of a psychiatric illness." Sikes concluded that psychotropic medication should not be prescribed absent a diagnosis of mental illness. According to Sikes's reports, he did not prescribe psychotropic medication because he diagnosed Plaintiff as suffering from polysubstance abuse and not a mental illness.

Sikes and other mental health professionals met with Plaintiff numerous times in the months ahead. Sikes himself saw Plaintiff sixteen times: June 3, July 1, August 12, September 4 or 6, 18, 20, 23, 25, and 30, October 9 and 25, November 1, 8, and 25, December 6, and January 29. In mid-September, when

4

Plaintiff's behavior began to deteriorate, Sikes reported, "It appears that this woman 'acts strangely' to get attention or perhaps to earn additional privileges or perhaps to avoid prosecution for her various disciplinaries." He recommended establishment and enforcement of clear rules in order to aid Plaintiff in learning to respect and obey authority. Sikes was confident of Plaintiff's capability to conform her behavior to institutional rules. He thus explained, "She has a temper as many inmates do but she should be held accountable for whatever rules she breaks." During each meeting with Plaintiff, Sikes continued to find no evidence of a psychiatric illness justifying treatment with medication.

Other members of the mental health staff also met with Campbell and reached similar conclusions. Plaintiff was placed on the caseload of mental health counselor Valarie Ford. Ford met with Plaintiff thirty-four times between August 1991 and January 1992: August 1, September 16, 17, 19, 20, 23, 24, 26, and 27, October 10, 14, 15, 16, 21, 22, 23, 24, 25, 27, 28, and 29, November 4, 6, 13, and 19, December 4, 5, 6, 7, 8, 10, 11, and 18, and January 14. Ford reports that she also saw Campbell informally almost every day during that time period. According to Ford, from the time of the first meeting she perceived Campbell's behavior as manipulative and saw no evidence of psychosis.

After her first meeting with Plaintiff, Ford referred Plaintiff to Psychologist Dr. Archer Moore, who also met with Plaintiff on August 1. Moore's report from that meeting states Plaintiff was "a very angry young woman who denie[d] any thought of hurting herself." Moore found "good reality contact" but "strong narcissistic features." During Plaintiff's stay at GWCI, Moore saw her six times total (August 1, September 5, 19, 26, and October 10 and 14), and he believed she suffered from a "Narcissistic Personality Disorder" and not a mental illness but stressed that he considered Plaintiff to be primarily Sikes's patient.

No one on the GWCI staff ever diagnosed Plaintiff as suffering from bipolar disorder or prescribed psychotropic medications. Instead, the GWCI staff attributed Plaintiff's behavior to the lingering effects of her prior substance abuse, the difficulties of adjusting to life in prison, and, on some occasions, deliberate attempts to manipulate officials.

5

B.      Restraints

During June, July, and August 1991, Plaintiff was sanctioned a few times for minor disciplinary infractions. In September 1991, however, Plaintiff began engaging in defiant behavior that eventually became violent, self-destructive, and even suicidal. On several occasions, she thrashed about her cell, climbed up on the sink, ripped her sheets to shreds, beat on and dismantled the overhead light, and attempted to obtain sharp objects. Plaintiff also bit and scratched prison officials and threatened to "hurt someone." Plaintiff often threatened to flood the toilet, which posed a security risk because it could mandate evacuation of other cells in the unit. In addition, Plaintiff started multiple fires in her cell, burning her food tray, her Bible, her clothing, and other such items. One clothing fire she started caused her entire cellblock to be evacuated.

Prison officials responded by removing potentially harmful belongings, instituting terms of solitary confinement, and restraining Plaintiff using several forms of restraint. Officials gradually increased the level of restraint. They used straightjackets on several occasions, which made Plaintiff's hands unusable but left her able to walk around the cell. On at least one occasion when officials used only a straightjacket, Plaintiff began banging her head and kicking. When Plaintiff's behavior escalated, officials also used "four-point restraints" at least five times, anchoring each of her arms and legs to a different point on the bed.

Throughout her stay at GWCI, Plaintiff demonstrated an uncanny ability to escape from most forms of restraint. She removed her straightjacket on numerous occasions, and at least once, she freed herself from four-point restraints.

Plaintiff's complaint, however, focuses mainly on the instances in which officials employed a third method of restraint that left her in an "L" shape[3] with her knees bent so that her calves were perpendicular to her back. To use this form of restraint, officials first immobilized Plaintiff's hands and arms using either a straightjacket or handcuffs behind her back. Next, they put handcuffs on her ankles. Finally, they used a

---

[3]Plaintiff calls it "hog-tying," and Defendants call it "tethering." We refer to it as the "L" shape method of restraint.

strap that ran the length from the handcuffs on her ankles up to the handcuffs on her wrists. This left Plaintiff in an "L" shape, with her body from her head to her knees defining the vertical part of the "L" and the lower portion of her legs—from her knees along her calves to her feet—defining the horizontal portion of the "L." This "L" shape restraint would have resulted in Plaintiff's being in a kneeling position had she been left upright. Most of the time, she was lying on her side with the "L" shape on a plane parallel to the ground. On at least one occasion, Plaintiff freed herself from the leg tether while this "L" shape form of restraint was being used.

Although Plaintiff entered GWCI in May 1991, Sikes first ordered Plaintiff restrained using this "L" shape method on September 18, 1991. On September 17, Plaintiff was observed standing on the bed with a sheet wrapped around the back of her neck. Believing Plaintiff might be trying to commit suicide, mental health staff removed her clothing and other belongings, placed her in seclusion, conducted security checks every fifteen minutes, and monitored her condition using a camera.

The next morning, Plaintiff was sent to Sikes for evaluation. She yelled at Sikes, turned over a table, and broke a phone. When Plaintiff was returned to seclusion and ordered to strip in front of male guards, she refused. Upon a second request, she complied but began running around the cell, kicking and butting the wall. Officials then contacted Sikes, who ordered Plaintiff placed in a straightjacket, which immobilized her hands and arms. Shortly thereafter, Plaintiff began banging her head and kicking. When informed of this behavior, Sikes ordered that Plaintiff be placed in a helmet and that the "L" shape restraint be employed. This immobilized her legs as well as her arms, preventing her from jumping, climbing, kicking, and running around the cell.

Between September 18 and October 28, officials restrained Plaintiff using this "L" shape method five times.[4] In addition to the twenty-seven hours on September 18 to 19, the "L" shape restraints were applied

---

[4]Plaintiff actually alleges "at least five times." Undisputed facts include five clear instances of the "L" shape restraint and other times when the exact type of restraint used is unclear.

7

for about one hour and twenty-five minutes on September 22, five hours on October 12 to 13, sixteen hours on October 23 to 24, and sixty-six hours and forty minutes on October 25 to 28.[5]

Although the restraints undoubtedly caused physical discomfort and emotional pain, they undisputedly caused Plaintiff no physical injury.  It is also undisputed that officials monitored Plaintiff's physical condition while she was restrained.  Plaintiff's circulation was checked each time the "L" shape method of restraint was applied, and security officers checked her *every fifteen minutes* while she was restrained.  Medical staff also provided regular checks; a nurse assessed Plaintiff's condition every few hours, and a doctor reevaluated the need for restraints every twenty-four hours.

On at least two occasions, Defendant Sikes declined to approve restraints requested by other officials. Plaintiff admits that on each of these occasions, Sikes explained to the requesting officers that restraints were inappropriate when Plaintiff did not pose an immediate threat to her own safety.

Although used five times between September 19 and October 28, the "L" shape restraints were not used during November and December 1991 or January 1992.  Plaintiff asserts the "L" shape restraints were discontinued because a prison deputy commissioner had issued an edict proscribing "hogtying."

C.      Outside Evaluations

In December 1991, Plaintiff requested to be taken off the mental health caseload.  The staff conferred and determined that Plaintiff did not have an Axis I diagnosis and that she would still have a counselor and

---

[5]Although we describe only the first use of the "L"shape restraint, the magistrate judge's order details all five occurrences and Plaintiff's violent and often self-destructive behavior precipitating the use of the "L" shape restraint.  The approximate periods of the "L" shape restraint are (1) from 10:05 a.m. on September 18 to 1:05 p.m. on September 19;  (2) from 10:20 p.m. to 11:45 p.m. on September 22;  (3) from 9:45 p.m. on October 12 to 2:45 a.m. on October 13;  (4) from 10:05 p.m. on October 23 to 2:15 p.m. on October 24;  (5) from 3:30 p.m. on October 25 to 10:10 a.m. on October 28.

> During these periods of restraint, Campbell was reevaluated every twenty-four hours and left in restraints only if her self-injurious inclinations were still apparent.  For example, restraints were continued during the longest (almost 67-hour) period of restraint because Campbell threatened to drink Clorox if the restraints were removed.

access to mental health services as needed in the general population. Thus, they granted her request and reassigned her to the general population on December 31.

On January 28, 1992, Plaintiff was placed in four-point restraints for setting four fires and breaking the lights in her cell. On January 29, Plaintiff wrapped torn strips from her jumpsuit around her neck in an attempted suicide. The next day officials sent her to a forensic mental health unit at Central State Hospital for additional psychiatric evaluation. Doctors there diagnosed Plaintiff as suffering from bipolar disorder and prescribed the psychotropic medications lithium and Mellaril.

Plaintiff was returned to GWCI for the remainder of her incarceration. Because Sikes was no longer working at GWCI, Plaintiff was evaluated by Dr. Richard Panico, who had just begun working as a part-time consulting psychiatrist at GWCI. Dr. Panico diagnosed Plaintiff as suffering from bipolar disorder and prescribed lithium.

Plaintiff was paroled in March 1993. After her release, Plaintiff was admitted to Georgia Regional Hospital in February 1994. The Georgia Regional Hospital records indicate that the February admission was due to "a serious overdose on lithium" and that Plaintiff had "a past history of suicidal threats."

Plaintiff was admitted again to Georgia Regional Hospital for reevaluation and treatment on April 28, 1994. At this admission, psychological testing was done to aid in evaluating Plaintiff. The Georgia Regional Hospital records reveal that Plaintiff was diagnosed as presenting a "personality disorder," "with borderline anti-social features, and an Axis I diagnosis of alcohol and substance abuse." At Georgia Regional Hospital, the treating psychiatrist specifically noted that "Plaintiff did not present an Axis I diagnosis of bipolar disorder."

## II. PROCEDURAL HISTORY

A.    Complaint

Plaintiff filed a complaint in state court in nine counts: (1) a § 1983 claim for deliberate indifference to serious medical needs; (2) a § 1983 claim for cruel and unusual punishment through use of stripping,

9

restraint, and isolation; (3) a § 1983 claim for excessive force; (4) a § 1983 substantive-due-process claim for punishment in lieu of treatment; (5) a § 1983 claim alleging infringements of Plaintiff's procedural-due-process and First Amendment rights; (6) a claim under the Georgia Tort Claims Act ("GTCA") for medical and professional negligence; (7) a GTCA claim for intentional infliction of emotional distress; (8) a GTCA claim for negligence and intentional infliction of emotional distress against Sikes and Moore as independent contractors; and (9) a claim alleging violations of the Georgia Constitution and a Georgia statute regarding types of punishment. The five defendants in Plaintiff's initial complaint were the Georgia Department of Corrections ("GDOC"), Mental Health Director Albert Duncan, Psychiatrist James Sikes, Psychologist Archer Moore, and Warden Art Gavin.

Defendants removed to federal court in the Northern District of Georgia. In federal court, Plaintiff filed her first amended complaint, which incorporates the claims in the initial complaint and adds Mental Health Counselor Valarie Ford as a Defendant. The district court granted Plaintiff's motion to amend.

The district court also granted in part Plaintiff's motion to remand to state court, remanding all claims against the GDOC and any official-capacity claims against Duncan, Sikes, Moore, Gavin, and Ford. Thus, remaining in federal court were Plaintiff's individual-capacity claims against Duncan, Sikes, Moore, Gavin, and Ford.

B.      Motions for Summary Judgment

After Defendants' motion for a transfer to the federal court in the Middle District of Georgia was granted, the parties consented to proceeding before a magistrate judge and began discovery. Defendants filed separate motions for summary judgment, arguing Plaintiff had failed to allege a constitutional violation and asserting qualified immunity.

C.      Magistrate Judge's Order

On January 28, 1998, the magistrate judge issued an order (1) granting Defendants Sikes, Moore, Gavin, and Ford summary judgment based on qualified immunity on all five of Plaintiff's § 1983 claims; (2)

10

granting those Defendants summary judgment on any Georgia Tort Claims Act claims still in federal court; and (3) with Plaintiff's consent, dismissing Duncan as an improper party.

D.      Scope of This Appeal

Plaintiff's appeal challenges only the magistrate judge's grant of summary judgment on her § 1983 claims against Defendants Sikes, Moore, Gavin, and Ford. Plaintiff does not appeal the dismissal of Defendant Duncan or the grant of summary judgment for Defendants on any Georgia Tort Claims Act claims remaining in federal court.  Plaintiff also abandons certain constitutional violations alleged in her first amended complaint.  She primarily focuses on two distinct alleged violations of the Eighth Amendment:  (1) Defendants' deliberate indifference to serious medical needs, and (2) Defendants' excessive force.

Thus, on appeal, we discuss whether the magistrate judge erred in granting summary judgment for Defendants Sikes, Moore, Gavin, and Ford on Plaintiff's § 1983 claims for deliberate indifference to serious medical needs and for use of excessive force.[6]

### III. REVIEW OF SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

We review the magistrate judge's grant of summary judgment *de novo.  Steele v. Shah,* 87 F.3d 1266, 1269 (11th Cir.1996).  In doing so, we "evaluate the summary judgment record in the light most favorable to ... the nonmovant," and we will affirm the district court's grant of summary judgment only if the record demonstrates that there was no genuine issue of material fact and that Defendants were entitled to judgment as a matter of law. *Id.;*  Fed.R.Civ.P. 56.

The magistrate judge's order and the parties' briefs focus almost exclusively on qualified immunity and the question of whether, at the time of Defendants' actions, the law clearly established that Plaintiff's rights were being violated.  We turn first to an alternate basis for summary judgment, inquiring whether this record contains any evidence of an underlying constitutional violation.  Because Plaintiff's evidence would

---

[6]To the extent that Plaintiff appeals other claims and issues, we find no reversible error in the decision of the magistrate judge. *See* 11th Cir. Rule 36-1.

not support a reasonable jury's finding that Defendants violated Plaintiff's constitutional rights, we need not address the applicability of qualified immunity. *See Killian v. Holt,* 166 F.3d 1156 (11th Cir.1999) (affirming district court's entry of summary judgment for defendants without qualified immunity analysis because plaintiff "failed to bring forth evidence from which reasonable jurors could find that defendant prison officials knew of and were deliberately indifferent to a substantial risk of serious harm"); *Hale v. Tallapoosa County,* 50 F.3d 1579, 1582 (11th Cir.1995) (affirming summary judgment for one defendant without relying on qualified immunity because the plaintiff's evidence was "insufficient to support the level of deliberate indifference and causal connection necessary");[7] *see also Cottrell v. Caldwell,* 85 F.3d 1480, 1489-92 (11th Cir.1996) (in an interlocutory appeal of the district court's denial of summary judgment, turning first to plaintiff's evidence of the constitutional violation itself and holding, "plaintiff has failed to show a violation of due process, and it necessarily follows that the defendants are entitled to summary judgment on qualified immunity grounds"); *Adams v. Poag,* 61 F.3d 1537 (11th Cir.1995) (in another interlocutory appeal of a district court's denial of summary judgment, holding defendants were entitled to summary judgment based on qualified immunity because plaintiffs had failed to present evidence of deliberate indifference to support their Eighth Amendment claim).[8]

## IV. EIGHTH AMENDMENT

---

[7]*See also Crawford-El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1586, 140 L.Ed.2d 759 (1998) (noting that when a claim requires "proof of wrongful motive," it may be preferable to begin summary judgment analysis by examining the proof of intent because "the immunity question ... sometimes requires complicated analysis of legal issues").

[8]We observe that this case—unlike *Cottrell* and *Adams*—is an appeal from a final judgment, where there is no dispute that we can examine first whether there is sufficient evidence to support a reasonable jury's finding a constitutional violation. However, *Cottrell* and *Adams* show that even in interlocutory appeals limited strictly to qualified immunity issues, the same procedure is permissible. In another qualified immunity interlocutory appeal, *Dolihite v. Maughon,* 74 F.3d 1027 (11th Cir.) *cert. denied,* --- U.S. ----, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996), this Court again focused on the "predicate element of the underlying constitutional tort," which is "part and parcel of the core qualified immunity issue which is immediately appealable." *Id.* at 1033 n. 3. Even if identification of the precise knowledge of each defendant is not "part and parcel of the core qualified immunity issue," it is " 'inextricably intertwined' with the core issue and thus would be immediately appealable." *Id.*

12

The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)); *see also Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (holding that "the Due Process Clause affords ... no greater protection"). Although the Constitution does not require comfortable prisons, it does not permit inhumane ones. *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Still, the Eighth Amendment does not authorize judicial reconsideration of "every governmental action affecting the interests or well-being of a prisoner," *Whitley,* 475 U.S. at 319, 106 S.Ct. 1078; instead, " '[a]fter incarceration, only the " 'unnecessary and wanton infliction of pain' "... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Id.* at 319, 106 S.Ct. 1078 (quoting *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations omitted))).

Crucial to establishing an "unnecessary and wanton infliction of pain" is some proof that officials acted with specific intent. This specific-intent requirement for an Eighth Amendment violation applies to both failure to provide proper medical care, *Steele v. Shah,* 87 F.3d 1266, 1269 (11th Cir.1996), and excessive force, *see Whitley,* 475 U.S. at 319-21, 106 S.Ct. 1078. However, the exact nature of the specific intent required depends on the type of claim at issue. *Whitley,* 475 U.S. at 319, 106 S.Ct. 1078. Thus, we address each claim in turn.

### V. "DELIBERATE INDIFFERENCE" TO SERIOUS MEDICAL NEEDS

The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Supreme Court has been careful to note, however, that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a

13

valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106, 97 S.Ct. 285. Thus, in *Estelle v. Gamble,* which first enunciated the "deliberate indifference" standard, the Supreme Court reinstated the district court's dismissal of a prisoner's § 1983 complaint for failure to state a claim. Noting that the complaint's primary allegation was that "more should have been done" to diagnose and treat a back injury, the Court explained, "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id.* at 107, 97 S.Ct. 285.

Subsequent Supreme Court cases have refined the inquiry. In *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), the Supreme Court explained that the Eighth Amendment applies only to punishments and that prison conditions are only punishment if a mental element of punitive intent is shown:

> The source of the intent requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual punishment. If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify.

*Id.* at 300, 111 S.Ct. 2321. Although the very imposition of a certain term in prison is punitive, the punitive purpose of the sentence itself does not convert every attribute of the place of incarceration into a punishment subject to Eighth Amendment scrutiny. Thus, conditions of confinement violate the Eighth Amendment only if they (1) rise to the level of a "serious" deprivation; and (2) result from the official's "deliberate indifference." *Id.* at 297-99, 111 S.Ct. 2321. *Wilson* and subsequent cases refer to these two required elements as an "objective component" scrutinizing the alleged deprivation and a "subjective component" examining the official's mental intent.

A.      *Farmer v. Brennan* Requires Proof Of Subjective Mental Intent

Most recently, in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court explained further the requisite "subjective component" of a conditions-of-confinement claim and defined the exact subjective mental state required for "deliberate indifference," as follows:

14

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. *But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.*

*Id.* at 837-38, 114 S.Ct. 1970 (emphasis added) (internal citation omitted). Thus, in light of *Farmer,* liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk. *Id.* at 837, 114 S.Ct. 1970. Proof that the defendant should have perceived the risk, but did not, is insufficient. *Id.* at 838, 114 S.Ct. 1970; *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996) ("There is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not ....' " (quoting *Farmer,* 511 U.S. at 838, 114 S.Ct. 1970)). Thus, the official must have a subjectively " 'sufficiently culpable state of mind.' " *Cottrell,* 85 F.3d at 1491 (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970). This "requirement follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.' " *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson,* 501 U.S. at 297, 111 S.Ct. 2321).

B.      Post-*Farmer* Decisions

This Court recently applied *Farmer* in the psychiatric medical needs context in *Steele v. Shah,* 87 F.3d 1266 (11th Cir.1996). In *Steele,* a Florida inmate claimed that a prison psychiatrist was deliberately indifferent in discontinuing prescribed psychotropic medication. The *Steele* Court explained that under *Farmer,* summary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's *subjective knowledge,* as follows:

since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, *Farmer v. Brennan,* 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994), a genuine issue of material fact exists *only if the record contains evidence, albeit*

15

> *circumstantial, Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981, *of such subjective awareness. See Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996) (acknowledging Farmer's requirement of subjective awareness and rejection of a solely objective test of deliberate indifference).

*Id.* at 1269 (emphasis added).

This subjective knowledge was evidenced in *Steele* by the underlying facts and circumstances of the case. The plaintiff had been prescribed psychotropic medications at a previous institution. *Id.* at 1267. When the plaintiff was transferred to a new prison, the defendant, Dr. Shah, saw the plaintiff for "less than one minute" and discontinued psychotropic medications. *Id.* Shah did not review any medical records other than the Treatment Plan listing medications prescribed by the prior institution, and he did not consult with any medical staff. *Id.* After Shah discontinued the plaintiff's medication, medical staff from the prior institution wrote the new prison expressing concern that the plaintiff was a suicide risk, had been on psychotropic medication, and was not now receiving his medication. *Id.* at 1268. Their letters clarified that the plaintiff had been diagnosed as having "Adjustment Disorder with Anxious Mood," needed psychotropic medication, had tried suicide twice, and was considered a suicide risk. *Id.* at 1267-68. Still, Shah did not respond; the plaintiff continued without psychotropic medication for the duration of his time at the new prison. *Id.*

This Court held that a jury would be entitled to find that Shah had discontinued the plaintiff's medication "on the basis of one cursory interview and without having reviewed any medical records beyond the Treatment Plan sent over from the Polk facility." *Id.* at 1270. The Court continued that a jury could further find that Shah " 'knew of a substantial risk from the very fact that the risk was obvious,' " that Shah "deliberately disregarded that risk," and that Shah "was aware from Polk personnel that Steele was considered by them to be a potential suicide risk, and that that was one basis for their prescription of the psychotropic drugs." *Id.* (quoting *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970).

The *Steele* Court noted that this circuit's two most directly relevant precedents both pre-dated *Farmer. Id.* at 1269 n. 2 (citing *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990); *Waldrop v. Evans,* 871 F.2d 1030 (11th Cir.1989)). However, the *Steele* Court found that *Farmer* did not necessarily affect the holdings in

16

those two pre*Farmer* cases, stating "*Greason* (surely) and *Waldrop* (almost as surely) based their specific

holdings on the existence of evidence of subjective awareness." *Id.* We understand *Steele* 's equivocation

about *Waldrop* 's holding because *Waldrop* discusses only what a reasonable person would have known—an

objective test.[9] However, we do examine *Greason* in detail because *Steele* relies so heavily on *Greason.*[10]

In *Greason,* the inmate's prior therapist at Gwinnett County Mental Health Center had sent a letter

to the prison doctor describing the inmate's current mental status, relating his history of mental illness, and

noting that he had been hospitalized thirteen times and diagnosed as a "schizophrenic" with suicidal

tendencies. *Id.* at 831-32. The therapist urged continuation of the inmate's medication for his diagnosed

mental illness and close monitoring. *Id.* The inmate's psychiatrist at the Georgia Department of Human

Resources also sent a letter reporting that the inmate continued to have suicidal thoughts and needed to be

maintained on his medication. *Id.* at 832. Both letter reports were in the inmate's clinical file. *Id.*

---

[9]*Waldrop* never addresses whether there is sufficient evidence for a reasonable jury to find the defendants knew their case was grossly inadequate. Instead, *Waldrop* inquires whether there is evidence that the defendants' actions were grossly incompetent and violated professional standards, and it focuses on what a reasonable person in the defendants' position would have known. *Waldrop,* 871 F.2d at 1034-36. Thus, *Steele* was correct in hesitating to rely on *Waldrop* 's assessment of the evidence now that *Farmer* has clarified the subjective-intent requirement. *Steele,* 87 F.3d at 1269 n. 2. Like the *Steele* Court, we focus instead on *Greason.*

[10]We question *Steele* 's characterization of *Greason* as basing its holding on evidence of subjective awareness. *Greason* is a pre-*Farmer* case that does not purport to apply the *Farmer* subjective prong. Instead, *Greason* examines the evidence of deliberate indifference in the context of an objective qualified immunity analysis. Although *Greason* does state, "we believe that a trier of fact could find that Dr. Fodor provided such care [grossly inadequate psychiatric care] and, moreover, that he realized that he was doing so at the time," *id.* at 835, the ultimate holding in *Greason* is that "a jury could find (1) that Dr. Fodor provided grossly inadequate care and (2) that *a reasonable person* in Dr. Fodor's position would have known that the care delivered constituted deliberate indifference to *Greason* 's Eighth Amendment rights." *Id.* (emphasis supplied).

Nonetheless, we are not required to resolve whether *Steele* correctly characterizes *Greason* 's holding, the precedential effect of *Steele* 's statements about and reliance on pre-*Farmer, Greason,* or whether the facts of *Greason* would have met the *Farmer* test because, in any event, *Greason* 's facts are readily distinguishable from those in this case.

17

Two and a half months after the inmate's arrival, the prison psychiatrist saw him for a few minutes, promptly concluded that his condition had stabilized, and discontinued his medications without reviewing the clinical file or assessing his mental status to determine his potential for suicide. About a month later, the psychiatrist saw the inmate again for only a few minutes.[11] Based on these facts, the *Greason* Court found that there was sufficient evidence from which a jury could conclude that the psychiatrist provided grossly inadequate medical care "and, moreover, that *he realized that he was doing so at the time.*" *Id.* at 835 (emphasis supplied).

The parties also cite other post-*Farmer* Eleventh Circuit decisions involving deliberate indifference to an arrestee's or an inmate's non-psychiatric medical needs. *See, e.g., Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1426-27 (11th Cir.1997) (involving a chronic alcoholic dying from a withdrawal-induced seizure while in pretrial detention after his wife warned jailers about his chronic alcoholism and propensity for life-threatening seizures as he withdraws, directly applying *Farmer,* and holding sufficient evidence presented from which a jury could find that each defendant "knew [the decedent] had urgent medical needs that would be significantly exacerbated by delay," that each defendant "planned to keep [the decedent] in jail without medical supervision or treatment until he had a seizure," and each defendant "delayed obtaining treatment for [the decedent] until after he suffered a seizure"); *Cottrell v. Caldwell,* 85 F.3d 1480, 1490-91 (11th Cir.1996) (involving an arrestee dying from positional asphyxia while in a police car, directly applying *Farmer,* and holding no evidence to support a jury finding that defendant police officers "were consciously aware of and disregarded the risk that [decedent arrestee] would suffocate" as a result of defendants' positioning and restraining decedent arrestee in police car); *Adams v. Poag,* 61 F.3d 1537, 1543-48 (11th Cir.1995) (involving inmate with acute asthma and inability to breathe, reversing the denial of qualified

---

[11]Later, the inmate's parents visited the inmate in prison and reported to an assistant who worked under the psychiatrist's supervision that the inmate had suicidal thoughts. Fearing the inmate might attempt suicide again, the parents urged the assistant to have the inmate transferred to a hospital. The assistant did nothing and did not contact the psychiatrist. Twenty-four days later, the inmate hung himself. *Id.* at 832-33.

18

immunity, and holding that evidence created fact issues regarding medical malpractice but not deliberate

indifference).[12]  Although helpful guidance, these three decisions do not involve deliberate indifference to

psychiatric medical needs.  Thus, we have focused instead on *Steele* and *Greason,* which do.[13]

C.      Plaintiff's Contentions

We now apply the teachings of *Farmer, Steele,* and *Greason* to this case.  Plaintiff contends that

Defendants' medical care was grossly inadequate and that Defendants knew their care was grossly inadequate.

According to Plaintiff, the medical care Defendants provided was grossly inadequate because Defendants

misdiagnosed her as having a polysubstance abuse disorder when they knew or should have known she had

bipolar disorder, discontinued medication that would have treated her bipolar disorder, improperly used

behavior modification techniques, and waited eight months before sending her outside the prison for

---

[12]Although post-*Farmer, Adams* does not cite or discuss *Farmer,* but it nonetheless stresses that in this Circuit "cases have consistently held that knowledge of the need for medical care and an *intentional* refusal to provide that care constitutes deliberate indifference."  61 F.3d at 1543 (emphasis supplied).

[13]The parties also cite this Court's post-*Farmer* decisions in *Dolihite v. Maughon,* 74 F.3d 1027 (11th Cir.1996), and *Hale v. Tallapoosa County,* 50 F.3d 1579 (11th Cir.1995).  However, we focus on *Steele* as it involves the subjective element of deliberate indifference (as opposed to the objective qualified immunity analysis in *Dolihite* ) and psychiatric medical needs (as opposed to inmate-on-inmate violence in *Hale* ), and we discuss *Greason* because of *Steele* 's reliance on it.

> *Dolihite* concerns a juvenile who hung himself while involuntarily civilly committed at a state psychiatric facility, but the majority opinion does not cite *Farmer* or discuss the subjective prong outlined in *Farmer.*  Instead, the majority opinion in *Dolihite* addresses only the objective prong of qualified immunity—whether "a reasonable professional in defendant's shoes would have known that his challenged actions (or inaction) violated plaintiff's constitutional rights."  *Id.* at 1046.

> In *Hale,* the plaintiff arrestee sued for damages arising from being beaten by other occupants of an overcrowded, small "bullpen" with detainees not segregated based on proclivity for violence or reasons for confinement.  50 F.3d at 1580-81.  The case turned on whether defendants knew about the significant risk of inmate-on-inmate violence but knowingly disregarded that risk and kept the plaintiff arrestee in that bullpen.  *Id.* at 1582-84.  The Court stressed the evidence that officials admitted knowing that inmate-on-inmate violence occurred in that overcrowded "bullpen" on a regular basis and resulted in injuries requiring medical treatment.  *Id.* at 1583.

19

diagnostic tests. Plaintiff also submits expert testimony stating Defendants' medical care was grossly inadequate, while Defendants' experts state Defendants complied with the applicable standard of care.

After review, we agree with the magistrate judge that Plaintiff has presented insufficient evidence for a reasonable jury to find that Defendants knew that she had bipolar disorder, that Defendants knew they had misdiagnosed her as suffering from polysubstance abuse rather than bipolar disorder, or that Defendants otherwise knew their treatment was grossly inadequate but proceeded with the treatment anyway. Without evidence to establish the subjective mental intent prong of deliberate indifference, Defendants are entitled to summary judgment under *Farmer*. We address Plaintiff's evidence against each Defendant in turn.

D.      Defendant Sikes

Defendant Sikes is a psychiatrist who worked part time at GWCI. Sikes first met with Plaintiff on June 3, 1991, a few days after her transfer to GWCI, and he gave the order to discontinue her psychotropic medication. Sikes himself saw Plaintiff sixteen times during the eight months before he determined that she needed to go to Central for further mental health examination. Sikes was also consulted by mental health staff on numerous other occasions, and he was repeatedly called upon to advise correctional officers on how to respond to Plaintiff's self-destructive behavior.

Sikes's liability turns on whether he knew Plaintiff had bipolar disorder, or knew he was misdiagnosing Plaintiff, or knew his treatment was otherwise grossly inadequate but proceeded with the treatment anyway. Sikes's reports show he diagnosed Plaintiff as suffering from polysubstance abuse, and Plaintiff agrees that psychotropic medication is not proper treatment for polysubstance abuse. Plaintiff's complaint asserts principally that Sikes misdiagnosed her condition, that she had bipolar disorder rather than merely suffering from polysubstance abuse, that her behavior made it obvious that she had bipolar disorder, and that Sikes should have known both that she was bipolar and that medication was the proper treatment for bipolar disorder. In addition, Plaintiff argues any treatment she did receive was both grossly inadequate and detrimental to her bipolar condition.

20

1.      Facts Regarding Sikes's Treatment

Sikes is entitled to summary judgment on Plaintiff's deliberate-indifference claim because Plaintiff failed to present evidence from which a reasonable jury could infer that Sikes knew she had bipolar disorder, or knew he was misdiagnosing Plaintiff, or knew his treatment was otherwise grossly inadequate but proceeded with the treatment anyway. *See Steele,* 87 F.3d at 1269; *Greason,* 891 F.2d at 835. Turning first to the initial diagnosis and discontinuation of medication, the undisputed evidence shows that Sikes discontinued Plaintiff's medication only after Sikes personally interviewed Plaintiff and reviewed a three-page report by Weathers, who had performed an extensive review of Plaintiff's history and symptoms.[14] It is also undisputed that Sikes, unlike the psychiatrists in *Steele* and *Greason,* conducted multiple follow-up sessions and observed Plaintiff's behavior repeatedly once she was off medication; altogether, he met with Campbell sixteen times. Moreover, Weathers's report revealed the Cobb County jail told Weathers that Campbell's suicidal threats might be an attempt to manipulate officials as they were reducing her medication. In stark contrast, the professionals previously responsible for the plaintiff inmates in *Steele* and *Greason* stressed the inmates' suicidal tendencies and prior psychiatric diagnoses and urged continued medication.

Plaintiff faults Sikes for not obtaining and reviewing her actual medical records from the Cobb County jail or her prior thirteen hospitalizations as a juvenile. However, Sikes reviewed (a) Weathers's detailed summary of Weathers's communications with the Cobb County jail, which included an account of Campbell's symptoms and treatment at the jail, and (b) Weathers's summary of Plaintiff's personal history, which included an account of mental health problems as a juvenile and a prior hospitalization. Moreover, the jail records and prior hospitalization records themselves, which are in evidence in this case, contain no diagnosis of bipolar disorder.

---

[14]Sikes says he also performed an independent review of Plaintiff's history, but Plaintiff disputes that. We thus rely only on Sikes's personal interview of Campbell and his review of Weathers's report.

Plaintiff also points to the fact that Sikes did know she was prescribed Trilafon and lithium while at the Cobb County jail, which she says should have put Sikes on notice she had bipolar disorder. However, the Cobb records themselves show Plaintiff was placed on Trilafon and lithium without indicating a diagnosis of bipolar disorder. Indeed, in an affidavit, Dr. Youngleson, who prescribed the medication at the jail, testifies (1) that Plaintiff was never given any diagnosis while at the jail; (2) that looking back, he believes Plaintiff suffered from a personality disorder rather than bipolar disorder; and (3) that Plaintiff's threats and self-destructive behavior seemed manipulative. The jail records also show Cobb County jail officials' concerns that Plaintiff might be "running a game on us" and acting out to manipulate officials.

Sikes's ongoing medical treatment is also readily distinguishable from that in *Steele* and *Greason,* where the psychiatrists basically did nothing to treat the inmates after discontinuing their medication. *See Adams v. Poag,* 61 F.3d 1537, 1544 (11th Cir.1995) (noting that "when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference"). In stark contrast, Sikes spent a great deal of time and effort working with Plaintiff. Sikes also recommended mental health counseling, consistent with his stated diagnosis that Plaintiff suffered from polysubstance abuse.[15] In addition, Sikes had other medical staff members monitor Plaintiff's behavior and symptoms, and he took affirmative steps to prevent Plaintiff from harming herself and others. Such actions readily distinguish Sikes's care from the deliberate indifference in *Steele* and *Greason.*[16]

2.     Expert Testimony

Lacking direct or circumstantial factual evidence to establish or to allow a jury to infer Sikes's knowledge, Plaintiff attempts to create a factual issue regarding Sikes's mental intent by submitting opinion testimony by medical experts. In affidavits and depositions, Plaintiff's experts testify that given Plaintiff's

---

[15]As noted above, Plaintiff was placed on the caseload of mental health counselor Valarie Ford. Ford conducted 34 counseling sessions with Plaintiff and saw Plaintiff informally on a near daily basis.

[16]Such actions also readily distinguish this case from the deliberate refusal to give the pre-trial arrestee any medical treatment in *Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1426-27 (11th Cir.1997).

prior hospitalizations and medication and her symptoms and behavior, Sikes should have known that Plaintiff had bipolar disorder and needed medication and that Sikes's treatment was grossly inadequate. In response, Defendants present expert testimony opining that Defendants' medical care fully complied with the applicable standards of care and that reasonable mental health professionals could have reached the same conclusions Defendants reached and taken the same actions Defendants took. Plaintiff's experts' opinion testimony directly contradicts that of Defendants' experts.

The question becomes whether the opinion testimony by Plaintiff's experts here creates a jury issue regarding Defendants' subjective mental intent required by *Farmer*. More specifically, the issue is this: since the facts and circumstances of this case do not allow an inference that Sikes not only should have perceived the risk but also actually did perceive it, does the opinion testimony by Plaintiff's medical experts based on those same facts and circumstances provide the missing *Farmer* link? The answer is no.

We begin by examining our precedent for guidance. This circuit has not discussed directly the precise role of expert testimony in a post-*Farmer* decision turning on the subjective mental intent of medical professionals sued for deliberate indifference to an inmate's serious psychiatric medical needs. Neither *Steele* nor *Greason* relies on opinion testimony by medical experts as evidence that the psychiatrist knew his care was grossly inadequate. In *Steele* the plaintiff presented no expert testimony at all,[17] and in *Greason* this Court relied on expert testimony only in addressing the objective prong of deliberate indifference.[18] Instead,

_____

[17]Indeed, another issue before the *Steele* Court was whether the district court had erred in refusing to appoint an expert witness to assist the plaintiff. 87 F.3d at 1271. The Court remanded for the district court to reconsider appointing an expert, noting that "the appropriate standard of psychiatric care" was at issue and that "[e]xpert opinion on that issue and its application here obviously might be important to the finder of fact." *Id.; see also Young v. City of Augusta,* 59 F.3d 1160, 1169-70 (11th Cir.1995) (upholding the district court's decision not to appoint an expert to assist plaintiff Young because "[t]he presence of a genuine issue of fact with respect to deliberate indifference to Young's medical needs is apparent from the face of the record" without any expert testimony).

[18]*Greason* relies on expert testimony in listing what the defendant psychiatrist would have known had he reviewed the inmate's file before discontinuing medication: there was testimony by a psychiatrist "that Greason possessed a great number of the characteristics associated with a high suicide risk." 891 F.2d at 835 n. 11. It also relies on expert testimony "that Greason received grossly inadequate care," and it

23

the egregious facts and circumstances in those cases created the requisite factual issue of deliberate indifference or wanton conduct.

The parties rely heavily on this Court's treatment of expert affidavits in *Dolihite v. Maughon,* 74 F.3d 1027 (11th Cir.1996). However, like *Greason, Dolihite* considers expert medical affidavits only in relation to the objective inquiry of qualified immunity—whether a reasonable medical professional in the defendants' position would have known that the defendants' actions violated the juvenile's constitutional rights.[19] *Dolihite* acknowledges that in the unique context of a claim of deliberate indifference to medical needs, expert testimony is relevant to ascertaining the applicability of qualified immunity:

> Our circuit has indicated that the testimony of medical experts can aid the court in determining whether qualified immunity is appropriate where allegations hinge upon the appropriateness of the actions of medical professionals, including mental health professionals.

*Id.* at 1046. *Dolihite* does not address the role of expert testimony in determining whether a plaintiff has sufficient evidence of the subjective mental intent required for a jury finding of deliberate indifference to serious medical needs under *Farmer.* Indeed, the majority opinion in *Dolihite* does not even cite *Farmer.* Moreover, *Dolihite* 's explanation for considering expert testimony is particular to the objective qualified immunity inquiry:

> Such expert medical testimony, making reference to specific deficiencies in a defendant's treatment and specific medically accepted standards might, in conjunction with the specific facts of a case, persuade a court that the medical defendant's actions in the case were clearly as great a departure from appropriate medical standards as previous departures found unconstitutional in prior cases—i.e., might persuade a court that a reasonable professional in defendant's shoes would have known that his challenged actions (or inaction) violated plaintiff's constitutional rights.

*Id.* at 1046. Thus, *Dolihite* 's consideration of expert testimony in applying qualified immunity's objective standard does not answer our question about the role of expert opinion testimony when applying *Farmer* 's subjective-intent requirement.

---

reaffirms a past case's holding that "the conflict among the experts concerning the propriety of the psychiatrist's professional judgment calls [must] be resolved by the jury." *Greason,* 891 F.2d at 835.

[19]*See* footnote 13 *supra.*

In two other conditions-of-confinement cases since *Farmer,* the plaintiffs failed to create triable issues regarding the defendants' subjective mental intent. Each opinion lends support to our ultimate conclusion regarding expert testimony, but admittedly neither is squarely on point here. In *Cottrell v. Caldwell,* 85 F.3d 1480 (11th Cir.1996), this Court held that the plaintiff's expert affidavit regarding what "was well known by police" was insufficient to create a jury issue regarding *Farmer*'s subjective component. *Id.* at 1491. The Court explained that "such a conclusory statement about police in general is not evidence about the mental state of these defendant officers in particular." *Id.* Although helpful guidance on the role of expert testimony, *Cottrell* does not fully answer the question here for two reasons. First, *Cottrell* involves expert affidavits about police officers' positioning and restraining arrestees in police cars, as opposed to expert medical testimony. Also, *Cottrell* appears to rely in part on the conclusory nature of the affidavits, and not all the testimony Plaintiff presents in this case is so conclusory.

Similarly, in *Adams v. Poag,* 61 F.3d 1537, 1543-48 (11th Cir.1995), this Court examined the plaintiff's expert testimony and found it failed to create a triable issue regarding the defendants' subjective intent. However, as noted above, *Adams* is framed in terms of qualified immunity and does not cite *Farmer.*[20] Moreover, *Adams,* too, seems to rest on particular deficiencies in the wording of the affidavits at issue-deficiencies that are present in a great deal of, but not all, the testimony Plaintiff relies on in this case.

Lastly, in *Hale v. Tallapoosa County,* 50 F.3d 1579 (11th Cir.1995), a post-*Farmer* inmate-on-inmate violence case, we considered experts' opinions, but only where other factual evidence showed the defendant sheriff's actual knowledge. Considering all the evidence, we found a triable issue as to whether the defendant possessed the subjective mental intent required by *Farmer. Id.* at 1583. Importantly, however, our finding of a factual issue did not rest on expert testimony alone. Although we noted the expert's testimony that "given the conditions in the months preceding [the attack], it was plainly foreseeable to a reasonable law enforcement official that a violent attack was likely to occur," we also stressed the defendant's own admission "that he

---

[20]*See* footnote 12 *supra.*

knew that inmate-on-inmate violence was occurring on a regular basis" and "that he knew the violence sometimes resulted in injuries requiring medical treatment." *Id.*

Lacking a controlling application of *Farmer* 's standard, we turn to *Farmer* itself. In *Farmer,* the Supreme Court made clear that the subjective mental intent prong requires that the official actually know of a substantial risk of serious harm to the inmate's health and then disregard that risk. *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. An "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Id.* at 838, 114 S.Ct. 1970. Under *Farmer,* proof that the defendant should have perceived the risk but did not is insufficient. *Id.* at 838, 114 S.Ct. 1970. *Farmer* also explains:

> When instructing juries in deliberate indifference cases with such issues of proof, courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly.

*Id.* at 843 n. 8, 114 S.Ct. 1970. Instead, the plaintiff must submit evidence that the medical professional defendant actually was aware of the significant risk of serious harm but deliberately proceeded with grossly inadequate treatment anyway.

The issue of subjective mental intent under *Farmer* is different from whether Sikes's medical treatment was negligent or grossly inadequate. To decide the issue of subjective mental intent under *Farmer,* a jury would inquire (1) whether Sikes was aware of facts about Plaintiff from which he could draw the inference that his present course of treatment presented a substantial risk of serious harm to Plaintiff and (2) whether he actually drew that inference but persisted in the course of treatment anyway. There is no direct or circumstantial evidence in this record from which the jury could infer Sikes's actual knowledge, and Plaintiff's experts' testimony does not provide the missing link under *Farmer*—at least under the facts and circumstances of this case. Indeed, allowing expert testimony that Sikes should or would have known to raise a jury issue as to whether he actually knew effectively would nullify Farmer's requirement of subjective mental intent. The deficiency of the expert testimony here arises not necessarily from the specific wording

26

of the experts' testimony—although some of Plaintiff's affidavits are lacking in many respects[21]—but from

the inherent opinion nature of expert testimony about what a person should or would have known. The

particular conflicting expert testimony here demonstrates only that there is a difference of opinion among

professionals about what is accepted practice within the psychiatric community and what a doctor should or

---

[21]While we do not rely on deficiencies in the wording of the expert affidavits, we do note a few of their shortcomings. For example, the experts' testimony contains many conclusory statements that Defendants were deliberately indifferent that do not govern our assessment of the evidence. *See Dolihite,* 74 F.3d at 1046-47 & n. 33 (explaining that "an expert opinion which is merely conclusory, even if couched in the language of the relevant legal standard, will be of little assistance to a court"); *Cottrell,* 85 F.3d at 1491 ("[A] conclusory statement about police in general is not evidence about the mental state of these defendant officers in particular."); *Rogers v. Evans,* 792 F.2d 1052, 1062 n. 9 (11th Cir.1986) (holding that an affidavit "phrased in conclusory terms" was "defective to create a factual dispute").

In addition, some of the affidavits rest on false factual predicates. For instance, the opinion of James S. Cheatham, M.D., seems to rely in part on the assumption that Plaintiff had been diagnosed as suffering for bipolar disorder prior to entering GWCI. Neither the Cobb County jail records nor the other medical records in evidence contain a prior diagnosis of bipolar disorder.

Also, of the expert affidavits Plaintiff presents, the principal affidavit that opines about what medical professionals would know is by John R. Paddock, who has a Ph.D. in psychology. Dr. Paddock reviews the behavior Defendants observed and the treatment they implemented and states, "Any person with professional credentials in the area of mental illness or the treatment of mental or emotional disorders would know that what the Defendants were doing was grossly improper in design, approach, and implementation." In certain areas, such as prescribing medicine, the training of psychologists and psychiatrists is not equivalent; thus, Dr. Paddock is not a competent expert to testify to what a psychiatrist like Sikes would know about the need to prescribe medicine.

Finally, there is the opinion statement of Kenneth I. Robbins, M.D. that Sikes's own testimony "demonstrates he knew his behavior was improper." However, Sikes's testimony itself either does or does not prove knowledge. Dr. Robbins's opinion about what Sikes's testimony shows is not probative. Moreover, Sikes's testimony, that Dr. Robbins refers to here, does not demonstrate that Sikes knew his behavior was improper. What Dr. Robbins is referring to here is that Sikes testified restraints were only to be used in limited situations and that Sikes left his patient in restraints over a weekend. Dr. Robbins concludes from Sikes's testimony about the limited use of restraints that Sikes knew leaving Plaintiff in restraints over a weekend was improper. However, Dr. Robbins fails to note the undisputed evidence that other psychiatrists were on call that weekend, that they were available to answer correctional officers' questions, and that they were called upon every twenty-four hours to reassess the continued need for restraints. Thus, Sikes's testimony does not create a factual issue regarding Sikes's knowledge that his care was grossly inadequate—nor does Dr. Robbins's opinion about Sikes's testimony.

27

would know. Plaintiff's experts' testimony here at best allows an inference by the jury that a doctor should have perceived the risk of serious harm but not an inference that the doctor actually did perceive the risk and persisted in his course of treatment anyway.[22]

Of course, rarely if ever will a defendant medical professional admit that he knew his course of treatment was grossly inadequate but proceeded with that treatment anyway. Therefore plaintiffs necessarily must use circumstantial evidence to establish subjective mental intent. *See Farmer,* 511 U.S. at 842, 114 S.Ct. 1970; *Lancaster v. Monroe County,* 116 F.3d 1419, 1426 (11th Cir.1997); *Steele,* 87 F.3d at 1269.

But expert opinion testimony is not essential to that task. For example, in both *Steele* and *Greason,* the plaintiffs created triable issues regarding the defendants' knowledge without any expert opinion testimony by presenting evidence of the particular facts and circumstances in those cases.[23] As noted above, the doctor in *Steele* stopped Steele's medication after a "less than one minute" meeting and without reviewing medical

---

[22]We located one post-*Farmer* circuit court decision squarely addressing whether expert medical testimony can create a factual issue about subject mental intent in cases involving deliberate indifference to serious medical needs. In *McKee v. Turner,* No. 96-3446 (6th Cir. Aug.25, 1997), the Sixth Circuit held the defendant psychiatrist was entitled to summary judgment because there was no evidence showing that the psychiatrist had acted with deliberate indifference. The expert's affidavit stated that the defendant psychiatrist had departed from accepted standards of medical care and that the risk of suicide "must have been obvious" to the defendant psychiatrist. The Sixth Circuit held that this affidavit was insufficient to support a finding of deliberate indifference, stressing that under *Farmer,* "the official's conduct is judged by what he actually knew, not by what a reasonable person in his shoes would have known." The Sixth Circuit concluded:

> The issue here is not whether Dr. Morcos committed medical malpractice, but rather whether Dr. Morcos had knowledge or facts about [Plaintiff] from which he could draw the inference that his present course of treatment presented a substantial risk of serious harm to [Plaintiff], and that he actually drew that inference, but persisted in the course of treatment anyway. There is nothing in the record demonstrating this.

124 F.3d at 198; *see also Williams v. Mehra,* 135 F.3d 1105 (6th Cir.), *vacated and set for reh'g en banc,* 144 F.3d 428 (6th Cir.1998).

[23]*See also Lancaster v. Monroe County,* 116 F.3d 1419, 1426-29 (11th Cir.1997) (finding defendants' own testimony regarding their knowledge and other evidence that the defendants were personally warned of the detainee's condition created triable issues regarding defendants' subjective mental intent without any expert testimony).

28

records. More importantly, the doctor proceeded with no medication in the face of warnings from the prior institution that the plaintiff was a suicide risk, had tried suicide twice, and needed psychotropic medication. The doctor's conduct was similar in *Greason:* he saw Greason for a few minutes, promptly concluded that Greason's condition had stabilized, and discontinued Greason's medications without reviewing the clinical file or assessing Greason's mental status to determine his potential for suicide. The letters in the clinical file showed Greason was a schizophrenic, had suicidal tendencies, and needed medication. In both *Greason* and *Steele,* this Court relied on facts and circumstances that made the risk of grossly inadequate care and suicide so obvious that a jury could infer the defendants' actual knowledge. In contrast, here there was no prior diagnosis of bipolar disorder, and the jail officials advised that they did not consider Plaintiff's suicide threats to be serious and that they perceived Plaintiff's aberrant behavior as an attempt to manipulate officials.

Because Plaintiff has not presented sufficient direct or circumstantial evidence to create a factual issue regarding Sikes's subjective mental intent and the experts' opinion testimony here does not provide the missing link, we affirm the magistrate judge's decision to grant Sikes summary judgment on Plaintiff's deliberate-indifference claim.

E.     Defendant Moore

 Defendant Moore was a licensed psychologist who worked one day a week at GWCI.[24] Unlike Sikes, Moore could not prescribe medication. Moreover, because Moore worked at GWCI only one day a week, his duties and responsibilities were decided week by week on an as-needed basis. Moore saw Plaintiff six times between August and October 1991. His last contact with Plaintiff was on October 24, 1991.

Plaintiff has failed to present sufficient evidence for a reasonable jury to find Moore knew that Plaintiff had bipolar disorder or that his treatment was grossly inadequate. Moore diagnosed Plaintiff as having a personality disorder, as opposed to a mental illness, and Plaintiff has presented no evidence that Moore knew his diagnosis was incorrect. Plaintiff's primary contention is that Moore should have performed

---

[24]On December 7, 1998, Moore's counsel filed notice that Moore had died on November 22, 1998.

psychological tests even though Sikes did not order them. Again, Plaintiff presents expert testimony about Moore's care, which might establish Moore breached the standard of care and was negligent but does not support a finding that Moore knew Plaintiff was misdiagnosed and needed medication or knew his care was otherwise inadequate.[25] Without evidence of Moore's subjective intent, Plaintiff's deliberate-indifference claim cannot succeed.

F.     Defendant Ford

Defendant Ford is a mental health counselor, untrained in diagnosing mental illness and unauthorized to prescribe medication. Plaintiff was assigned to Ford for counseling during most of the eight-month period in question. Ford had almost *daily* contact with Plaintiff.

Plaintiff focuses on two alleged deficiencies in the care Ford provided. First, Plaintiff points to an October 1991 memorandum Ford wrote to prison security personnel instructing that they impose maximum disciplinary penalties for Plaintiff's infractions of prison rules. The memorandum states that Plaintiff had received seventeen prior disciplinary reports, that Plaintiff had been evaluated several times by Drs. Moore and Sikes, that Plaintiff "does *not* currently have an Axis I diagnosis," and that therefore "[t]he current treatment goal for Ms. Campbell as recommended by Dr. Sikes and the mental health staff is behavior modification."

There is no evidence to support a jury finding that by writing the security memorandum Ford was deliberately indifferent to Plaintiff's serious medical needs. First, the memorandum also states that "[m]edical staff will be responsible for ensuring that medical needs are met according to policy." Second, Plaintiff has presented no evidence that Ford knew Plaintiff suffered from bipolar disorder—much less that Ford knew Plaintiff's self-destructive and defiant behavior stemmed from bipolar disorder. Moreover, Ford wrote this memorandum at Sikes's direction, acting on the express instructions of a medical doctor who was trained in

---

[25]Some of the expert testimony about Moore's care seems to rest on the erroneous assumption that Moore's knowledge about Plaintiff was commensurate with Sikes's. However, as with Sikes, we do not rely on particular deficiencies in the affidavits.

diagnosis of mental illness, had diagnosed Plaintiff with polysubstance abuse and not bipolar disorder, and had recommended behavior modification treatment as opposed to medication.

Second, Plaintiff faults Ford for the overnight "delay in treatment" once it had been determined that Plaintiff needed to go to Central for further evaluation. It is undisputed that on the night of January 29, Ford knew it had been determined that Plaintiff should be sent to Central. It is also undisputed that officials secured Plaintiff in four-point restraints overnight and sent her to Central the next morning. Plaintiff alleges that it was Ford's decision to delay the transfer and that Ford decided to apply four-point restraints without a prior order from a medical doctor.[26]

Again, however, Plaintiff has presented no evidence that Ford knew that Plaintiff had bipolar disorder or that such overnight delay amounted to grossly inadequate care. Dr. Paddock's affidavit purports to support a finding that Ford "had to know" the care Plaintiff received was grossly inadequate:

> Defendant Ford was in a position and exercising responsibility in which she would have had to know that further and additional mental health/psychological evaluation and assessment of Ms. Plaintiff were required by her and consistent with the competencies of other members of the treatment team (e.g., licensed psychologists and psychiatric physicians), and that the acts undertaken were grossly deficient.

As discussed regarding Sikes, this expert affidavit does not suffice to support a finding that Ford knew her care was grossly inadequate but persisted in that treatment. At best, it might support a finding that Ford's care was grossly inadequate or a finding that Ford should have known or perceived—or "had to know"—her care was grossly inadequate. However, as explained above, "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not....'" *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996) (citing *Farmer,* 511 U.S. at 838, 114 S.Ct. 1970).

G.    Defendant Gavin

---

[26]According to Plaintiff, the medical doctor's order approving the four-point restraints used on this occasion was signed almost two months later on March 24, 1991.

Plaintiff acknowledges that Defendant Gavin, the GWCI warden, was not employed as a mental health professional. Plaintiff claims only that Gavin was deliberately indifferent in supervising others who were deliberately indifferent to her serious medical needs. By its own terms, Plaintiff's claim against Gavin cannot succeed without evidence of an underlying constitutional violation by one of the mental health professionals. As explained above, the record contains no such evidence. Thus, Gavin is necessarily entitled to summary judgment on this claim.[27]

## VI. EXCESSIVE FORCE

Plaintiff also claims that even if Defendants' actions did not amount to deliberate indifference to her serious medical needs, their use of restraints constituted excessive force.

A.      Proof Required that Force Used Maliciously and Sadistically to Cause Harm

The Eighth Amendment's proscription of cruel and unusual punishments also governs prison officials' use of force against convicted inmates. *See Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (holding that "the Due Process Clause affords [convicted prisoners] no greater protection than does the Cruel and Unusual Punishments Clause"). To establish an Eighth Amendment claim for excessive force, however, Plaintiff must meet an intent requirement more stringent than *Farmer* 's deliberate-indifference standard: she must prove that "force was applied ... maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21, 106 S.Ct. 1078 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)); *see also Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Discussing this heightened specific-intent requirement in *Whitley,* the Supreme Court reiterated that force does not violate the Eighth Amendment merely because it is unreasonable or unnecessary: "The infliction of pain in the course of a prison security measure ... does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for

---

[27]Plaintiff's supervisory liability claim against Sikes fails for the same reason.

security purposes was unreasonable, and hence unnecessary in the strict sense." 475 U.S. at 319, 106 S.Ct. 1078. Reviewing the force used to quell a prison riot in *Whitley,* the Court explained that "whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Id.* at 320-21, 106 S.Ct. 1078 (quoting *Johnson,* 481 F.2d at 1033).

Subsequently, in *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), the Supreme Court extended *Whitley* 's holding outside the prison-riot context and applied the same heightened intent requirement to force used as a prophylactic, preventive measure. *See Whitley,* 475 U.S. at 322, 106 S.Ct. 1078 (acknowledging the distinction). The *Hudson* Court held that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6-7, 112 S.Ct. 995. The Court reasoned that even absent the exigency present during a riot-like disturbance, " ' "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." ' " *Hudson,* 503 U.S. at 7, 112 S.Ct. 995 (quoting *Whitley,* 475 U.S. at 321-22, 106 S.Ct. 1078 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979))). Thus, *Hudson* dictates that *Whitley* 's standard—force applied maliciously and sadistically to cause harm—applies to all claims that prison officials used excessive force against convicted prisoners.

In addition to defining the mental state required, *Hudson* and *Whitley* outline five distinct factors relevant to ascertaining whether force was used "maliciously and sadistically for the very purpose of causing harm": (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible

33

officials on the basis of facts known to them." *Whitley,* 475 U.S. at 321, 106 S.Ct. 1078; *see also Hudson,* 503 U.S. at 7, 112 S.Ct. 995. *Whitley* also narrows the precise inquiry applicable when deciding whether officials are entitled to judgment as a matter of law:

> courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support *a reliable inference of wantonness in the infliction of pain* under the standard we have described, the case should not go to the jury.

*Whitley,* 475 U.S. at 322, 106 S.Ct. 1078 (emphasis added).

B.      Eleventh Circuit Applications

Plaintiff's excessive-force claim focuses on restraints Defendants used while she was in isolation. Thus, we review prior decisions of this Court applying *Whitley* to uses of restraints and isolation.

Affirming summary judgment in *Williams v. Burton,* 943 F.2d 1572 (11th Cir.1991), this Court held that the officials' using four-point restraints and a gag was not excessive force. Officials placed Williams in four-point restraints, with gauze and tape over his mouth, for twenty-eight and one-half hours. *Id.* at 1574. There were only brief intervals for eating, physical exercise, and toilet use. *Id.* Noting that Williams had threatened to kill officials, spat on them, and thrown bodily fluids at them, this Court explained that the four-point restraints and gag were not excessive force but were used to prevent Williams from harming himself or officials:

> [t]he four-point restraints were used to reduce or eliminate Williams' ability to inflict physical harm against either himself or the correction officers. The restraints were not used for the purpose of inflicting pain. The gauze padding and tape were used to prevent Williams from encouraging further unrest among the other inmates in the segregation unit, as well as to protect the officers from his continuing spital assault.

*Id.* at 1575. Also important to the *Williams* decision were the observations (1) that although the inmate "experienced some discomfort because of his restraint, no actual injury was inflicted" *id.;* and (2) that "constant monitoring and examinations by medical personnel" were adequate to safeguard the inmate's well-being. *Id.*

34

*Williams* stresses that courts should afford great deference to prison officials regarding the use of restraints as a prophylactic or preventive measure, stating:

> How long restraint may be continued calls for the exercise of good judgment on the part of prison officials. Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm, the courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline.

*Id.* at 1576 (internal citations omitted). This Court also found the officials' "continuous observation and management of Williams during his restraint" showed their good faith, and we concurred with the district court's holding that "Williams' history of persistent disobedience and the potential for a disturbance in the segregation unit justified the continued use of the restraints and gag until the officers were reasonably assured that the situation had abated." *Id.*

Similarly, in *Sims v. Mashburn,* 25 F.3d 980 (11th Cir.1994), this Court upheld the officials' use of a stripped cell for twenty-nine hours and reversed the district court's grant of judgment for the inmate. The inmate in *Sims* hung various items over the window to his cell, preventing prison officials from observing his behavior; he placed a towel in the toilet, which officers took as an implicit threat to flood the segregation unit; and he threatened that if officials entered his cell, "I'll buck; you'll have to kill me." *Id.* at 981. On that basis, officials stripped his cell and removed all clothing except his undershorts, and they disconnected the water to his toilet. *Id.* at 981-82.

In determining whether the officials had used good faith or acted "maliciously and sadistically to cause harm," this Court observed that the officers had followed the prison's operating procedures for stripping cells, which required, among other things, documenting the incident and checking on the inmate's status every fifteen minutes. *Id.* at 985-86. Again, we emphasized that compliance with an established prison policy evidences an official's good faith, particularly when, as in *Sims,* "[t]he policy itself reflects a well-developed and planned procedure." *Id.* at 986. In the field of prison discipline, "prison officials, not judges, are experts." *Id.*

35

C.        Application To This Case

Plaintiff focuses on the instances in which officials used the "L" shape restraint in addition to the straightjacket. The record reflects that officials used the "L" shape restraint at least five different times for periods of twenty-seven hours on September 18 to 19, one hour and twenty-five minutes on September 22, five hours on October 12 to 13, sixteen hours on October 23 to 24, and sixty-six hours and forty minutes on October 25 to 28.

As explained above, Plaintiff's excessive-force claim depends on whether these periods of restraint were instituted "maliciously and sadistically for the very purpose of causing harm." Precedent dictates that this determination be guided by the five *Hudson*/*Whitley* factors outlined above, by deference to prison officials' punitive judgments, and by this Court's previous holdings that compliance with prison policies evidences officials' good faith. For several reasons, such considerations convince us that the record here does not create a factual issue regarding malicious or sadistic intent.

First, the urgent need for force was readily apparent each time the "L" shape restraint was applied; the undisputed facts show Plaintiff posed a serious threat to herself and to others. Plaintiff not only told officials that she was considering suicide but also actually took steps toward harming herself on more than one occasion. When the "L" shape restraint was applied initially in September 1991, officials found her standing on the bed with a sheet around her neck. As noted above, on other occasions, she thrashed about her cell, climbed up on the sink, ripped her sheets to shreds, beat on and dismantled the overhead light, and attempted to obtain sharp objects. Plaintiff also bit and scratched prison officials, and she repeatedly threatened to "hurt someone." Some of Plaintiff's actions posed a security risk as well. She regularly threatened to flood the toilet, and she often started fires in her cell, burning such items as her food tray, her Bible, and her clothing. One clothing fire mandated evacuation of her entire cellblock.

Moreover, lesser restraints were ineffective in curbing Plaintiff's dangerous behavior. Plaintiff freed herself from straightjackets on multiple occasions. In addition, on one occasion when officials used only a straightjacket, Plaintiff began banging her head and kicking.

Although resulting in physical discomfort and emotional pain, the restraints undisputedly caused Plaintiff no physical injury. More importantly, the officers carefully monitored Plaintiff's physical condition while she was restrained. They checked Plaintiff's circulation each time they applied the "L" shape method of restraint, and security officers checked Plaintiff every fifteen minutes while she was restrained. There were also regular checks by medical staff, with a nurse evaluating Plaintiff's condition every few hours and a doctor reassessing the need for restraints every twenty-four hours.

Additionally, the severity of the restraint was tempered somewhat by attention to Plaintiff's basic physical needs. During periods of restraint, Plaintiff was given "toileting" on request,[28] offered meals at regular intervals, and sometimes given a mattress rather than being made to lie on the floor.

Also evidencing the officials' good faith is their compliance with prison procedures for using restraints. GWCI policies provide for extensive documentation and monitoring when restraints are used, and Defendants met and exceeded those requirements. For example, in addition to completing the required written documentation, Defendants videotaped some of the instances in which they used the "L" shape restraint.[29]

In addition, on at least two different occasions, Sikes declined to approve restraints when other officials requested them. Each time, Sikes instructed the requesting officials that restraints should not be applied when Plaintiff did not pose a threat to her own safety. Such decisionmaking by Sikes hardly betrays a malicious or sadistic motive.

---

[28]Plaintiff asserts that there was one instance in which she urinated on herself while in restraints and the situation was not discovered for some hours.

[29]Plaintiff entered in the record before the magistrate judge a videotape of several "L" shape incidents, and that tape is part of the record on appeal as well.

37

Plaintiff provides no viable reason to depart from the conclusion dictated by these considerations. Her main contention is that four-point restraints would have been equally effective and less dehumanizing than the "L" shape. In addition, she points to a deputy prison commissioner's testimony that he was shocked to hear that prisoners were being "hog-tied." However, such evidence raises "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," *Whitley,* 475 U.S. at 322, 106 S.Ct. 1078, and would not suffice to support a jury finding that the officials restrained Plaintiff in this manner "maliciously and sadistically for the very purpose of causing harm." *Id.* at 320-21, 106 S.Ct. 1078.

There is also no showing that the "L" shape method of restraint used here violated prison policies.[30] Both GDOC and GWCI policies clearly allowed restraints to be used to curb dangerous behavior, and neither policy forbade this particular method of restraint. GDOC operating procedures merely authorized restraints "to prevent the inmate from hurting himself or others" and defined "hard restraints" versus "soft restraints." GDOC Standard Operating Procedure No. VC01-0014 (Revised Oct. 1, 1989).[31] Similarly, GWCI policy authorized restraints as "a temporary means of controlling an inmate's destructive behavior toward herself and others." GWCI Policy Statement No. 801.1 (activated Nov. 1, 1989; revised June 13, 1991). GWCI policy also examined the costs and benefits of several different methods of restraint, noting that "[t]he following comments should be reviewed and considered in making a decision as to which devices to use when restraint is necessary." *Id.* The "L" shape method used here was not expressly listed, but GWCI policy

---

[30]It is far from clear in the case law that officials' violating prison policy would necessarily establish the requisite subjective mental intent. In this case, however, because there is insufficient evidence to support a finding that prison policies were violated, we need not address whether a violation of prison policies is per se malicious and sadistic.

[31]We refer to the policies in effect when the challenged instances of restraint occurred. There is some indication in the record that since that time, the policies may have been amended to proscribe "hog-tying."

expressly provided in a separate subsection that a physician might "also consider other options as to the method of restraint most likely to be appropriate." *Id.*

Plaintiff argues that the absence of "hog-tying" from the lists of possible restraint methods meant the "L" shape method used here was forbidden. In support of that contention, she offers the testimony of a deputy prison commissioner who interpreted the state operating procedures to ban "hog-tying." However, the deputy commissioner's testimony is insufficient to create a triable issue in the face of the clear and unambiguous language of the policies themselves, which did not ban or in any way proscribe this method of restraint but instead expressly permitted doctors to consider using other methods of restraint.

## VII. CONCLUSION

Because we find insufficient evidence to support a jury's finding that any of the Defendants possessed the subjective mental intent required to support Plaintiff's deliberate-indifference and excessive-force claims, the magistrate judge's grant of summary judgment for Defendants Sikes, Moore, Gavin, and Ford is AFFIRMED.